ESTATE OF FRANCIS M. HENDRY, DECEASED, FIRST NATIONAL BANK OF TAMPA, EXECUTOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8605–72. Filed September 24, 1974.

---

*William O. E. Henry* and *Michael J. Canan*, for the petitioners.
*Robert J. Shilliday, Jr.*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency of $155,-563.13 in the Federal estate tax liability of the Estate of Francis M. Hendry. The only issues for decision are: (1) Whether decedent retained such an interest in a 655-acre residence-ranch which he transferred to his wife in 1948 as to make the value thereof includable in his gross estate under section 2036(a)(1), I.R.C. 1954; and (2) whether the balance due, in the amount of $155,000, on three notes upon which the decedent and his wife were each personally liable, can be deducted by the estate as a debt of the decedent under section 2053. Respondent disallowed the deduction under section 2053, but since he included the residence-ranch in the decedent's gross estate, he allowed the outstanding principal of these debts to be used as an offset against the value of the property. Consequently, if we determine that the transferred real property is includable in the decedent's estate, we need not decide the second issue because no controversy would exist.

FINDINGS OF FACT

Certain facts have been stipulated and are so found.

The petitioner is the Estate of Francis M. Hendry, deceased. First National Bank of Tampa, a corporation, is executor of the estate. At the time the petition was filed, the executor was located at 416 Franklin Street, Tampa, Fla.

The estate tax return for the decedent's estate was filed on February 14, 1970, with the director, Southeast Service Center, Chamblee, Ga. The decedent, Francis M. Hendry, was born July 4, 1891, and died November 14, 1968. His last will and testament, dated February 13, 1966, was admitted to probate by the County Judge's Court, in and for Hillsborough County, Fla., on November 26, 1968. Hendry was a resident of Thonotosassa, Hillsborough County, Fla., at the date of his death.

Decedent and Martha C. Hendry were married April 29, 1929, and remained husband and wife until decedent's death. Decedent and Martha had three sons, Mark, Harold, and Aaron. From 1929 to his death, the decedent was in the marine contracting business; Martha was a housewife.

From 1941 through 1944, the decedent purchased seven parcels of property on the eastern bank of Lake Thonotosassa, Fla., which is located in the northeastern part of Hillsborough County, Fla.,

for a total acquisition price of $18,000. The seven parcels were contiguous and when assembled under decedent's ownership, formed an area of 655 acres. Hereinafter this property shall be referred to as the Hillsborough County property or the Hendry Ranch.

In 1943, decedent purchased about 25 head of cattle and began grazing them on the Hillsborough County property. From 1943 to July 10, 1948, decedent purchased two trucks, a John Deere tractor, a Case tractor, a cultivator, a stove and heater, a jeep, and other miscellaneous equipment costing under $1,000. The total cost of this equipment was $7,036.71. During the same period, decedent expended $58,513.07 on agricultural operations, farm labor, livestock, feed, fertilizer, fuel, citrus trees, and minor miscellaneous farm expenditures on the same property. During this time period, decedent sold cattle and citrus for amounts totaling $13,519.86. From July 10, 1948, through December 31, 1948, proceeds of $4,468.62 were realized from the sale of citrus and cattle.

From 1943 through July 10, 1948, decedent was developing a citrus grove and making numerous other improvements on the Hillsborough County property. Some of the funds needed in the operation of the Hillsborough County property from 1942 through July 10, 1948, were derived from the Hendry Corp. of which the decedent was the owner and president. The remaining funds expended in connection with this property from 1943 through July 10, 1948, were derived from the decedent's personal checking account. The sources of funds in the decedent's personal checking account included the decedent's personal income, loans from the Hendry Corp., and ranch income.

Most receipts from the sale of ranch assets from 1943 through July 10, 1948, were deposited in the decedent's personal checking account.

From 1943 through July 10, 1948, decedent operated the Hillsborough County property as a cattle and citrus farm.

On July 10, 1948, decedent conveyed the Hillsborough County property to his wife, Martha C. Hendry, by a general warranty deed, which contained no reservations or limitations. The value of the Hillsborough property as of July 10, 1948, was $53,650, which consisted of $23,650 for the 655 acres of land and $30,000 for improvements comprised of a one-story frame residence built in 1939, a barn and hayloft, a bunkhouse and storage shed, a garage and storeroom, two one-story frame tenant houses, and other items such as chicken-houses, pumphouses, and wells. There were 200 to 250 head of cattle on the property at that time. On July 12, 1948, the deed dated July 10, 1948, was recorded in the official records of Hillsborough County, Fla.

Martha Hendry was not a businesswoman. Although she became

familiar with the ranch and grove operations, primarily through conversations with the deceased, she never gained sufficient expertise to run the ranch on a day-to-day basis, and made no effort to do so.

At no time in connection with the transfer of the Hillsborough property to Martha was there any written expression between the decedent and Martha relating to the continued use, enjoyment, or possession, or income from, the property, or relating to any right to determine who would possess or enjoy the property or the income therefrom.

Martha believed that the Hillsborough County property and the ranch operation belonged to both the decedent and her prior and subsequent to July 12, 1948.

No change in the operation or management of the ranch occurred subsequent to the transfer of the ranch to Martha. After July 10, 1948, decedent continued to operate the property as a cattle and citrus farm. He continued making improvements in the property, almost all of which were paid for by decedent from his personal checking account or with loans from the Hendry Corp. The sources of funds in the decedent's personal checking account included ranch income, the decedent's personal income, and loans from the Hendry Corp.

Most expenses of the Hillsborough County property which were not paid by the Hendry Corp. (and simultaneously charged to decedent's account on the corporate books), subsequent to July 10, 1948, were paid with checks from the decedent's personal checking account or were paid out of the account No. 039941 entitled the "Hendry Ranch Account," apparently opened in 1961 at the First National Bank of Tampa, Fla. Of approximately 1,505 checks signed on the Hendry Ranch account between January 1963 and December 1968, Martha signed 1,372, the decedent signed 38, and Harold Hendry, the son of the decedent and Martha, signed 95 checks. The checks drawn on this account were mainly used to pay salaries of ranch employees. Deposits into this account were from decedent's personal bank account. The real property taxes on this property were billed to Martha by the tax assessor of Hillsborough County on all billings prepared after July 10, 1948. From 1953 to 1968 the tangible personal property tax assessments on the Hillsborough County property were billed to the decedent, F. M. Hendry. The decedent paid these real and tangible personal property taxes from his personal checking account.

From 1947 to 1949 the invoices pertaining to expenses of the Hillsborough County property were addressed to F. M. Hendry or Capt. F. M. Hendry. Several additional invoices were directed to the Hendry Corp. or the Hendry Ranch. However, the trend in the billings to the farm operation on Hillsborough County property was toward a

progressively greater number of invoices being sent to the "Hendry Ranch" during the years 1950 to 1968. During 1967 and 1968 only four companies headed their billings "F. M. Hendry Ranch." Two of these companies continued to entitle their bills "F. M. Hendry Ranch," during 1969.

The ranch and grove ledger and journal were maintained by employees of the Hendry Corp. and stored at the offices of the Hendry Corp. The records of the ranch and grove operation were also stored at the corporate offices. Daily accounts were kept at the ranch by a manager employed by decedent.

Martha Hendry did not make any financial contributions to the operations or improvements on the Hillsborough County property. Most agricultural assets of the Hillsborough County property were purchased by the decedent with his own funds or with funds he withdrew from the Hendry Corp. In 1955, two black Angus bulls were purchased in the name of F. M. Hendry. Four black Angus bulls were also purchased under the decedent's name in 1963. Decedent received registration certificates for two of the bulls purchased in 1963, and these bulls were subsequently registered in his name. These bulls were used in agricultural activities on the Hillsborough County property. Other black Angus bulls were purchased in other years for use on the Hillsborough property. The purchaser of these bulls cannot be ascertained.

On December 4, 1957, decedent leased for 10 years certain property owned by the State of Florida from the trustee of the Internal Improvement Fund of the State of Florida. This property consisted of 100 acres of land, lying along the shores of Lake Thonotosassa, adjacent to the Hillsborough County property. The lease land was used as additional grazing land for the cattle of the ranch. Frequently, rising water from the lake made grazing on the leased acreage difficult. Occasionally, it made grazing on some of the Hillsborough County property difficult. In order to prevent this flooding a levee was constructed beginning in 1960. During the following years the following amounts were spent on this levee:

| Year | Amount |
| --- | --- |
| 1960 | $40, 678. 01 |
| 1961 | 20, 201. 83 |
| 1962 | 1, 133. 32 |

For the taxable years 1961, 1962, and 1963, the expense was claimed as a soil conservation expense. This type of deduction was disallowed because the levee was made of concrete. Since the ranch and grove operations were considered a business, a farm depreciation deduction was allowed based on a 20-year useful life. On December 5, 1967, the lease

expired and was not renewed. Cattle continued to be grazed on the leased property through November 14, 1968.

In 1951 the decedent applied for and was issued an Internal Revenue Service employer identification number in the name of F. M. Hendry. From January 30, 1956, to April 7, 1960, the workmen's compensation insurance under the Federal Insurance Contribution Act carried to protect the agricultural employees on the Hillsborough County property was in the name of F. M. Hendry as owner of the insurance policy. Effective April 8, 1960, the insurance was assigned to F. M. Hendry and Martha C. Hendry. For the years June 1, 1961, through January 1, 1967, the workmen's compensation insurance was carried in the names of F. M. Hendry and Martha C. Hendry as owners of the insurance policy.

The joint individual income tax returns of F. M. Hendry and Martha Hendry for the taxable years 1961 and 1962 state that the business name and address of the Hillsborough County property farm operation was F. M. Hendry, Tampa, Fla. On their individual income tax returns for 1963 through 1967, the same name and address was listed for the Hillsborough County property farm operation with the addition of decedent's employer identification number A59–0652047 for farm operation.

On the joint individual income tax returns for F. M. Hendry and Martha C. Hendry for the taxable years 1951 through 1955 the occupation of F. M. Hendry was reported as executive. In the taxable year 1962, the accounting firm of Rex Merghen & Co. began preparing joint individual income tax returns of F. M. Hendry and Martha, and continued to do so for the remaining taxable years of F. M. Hendry's life. The joint individual income tax returns for the years 1961 through 1967 show the occupation of F. M. Hendry as executive and rancher. No occupation is shown for Martha on these returns.

The ranch and grove operation of the Hillsborough County property was a business beginning in 1945 until decedent's death. Cattle and citrus from the Hendry Ranch were sold in each of the years from 1945 through 1968.

Most income derived from the sale of ranch assets, cattle, and citrus from 1948 through November 14, 1968, was placed in decedent's personal checking account. Decedent then wrote checks for most of the cost of farm operations from this checking account or to the Hendry Ranch Account from which checks were written to pay costs associated with the Hillsborough County property. Decedent also wrote checks unassociated with the Hillsborough County property from this account. Some of these checks were written for the direct benefit of

Martha C. Hendry, such as payments of premiums on life insurance policies owned by her on decedent's life, and some were written for the personal benefit of decedent.

The decedent paid the excess expenses over the income from the ranch operations of the Hillsborough property from 1948 through November 14, 1968. The following schedule shows the gains and losses resulting from the agricultural operations on this ranch during these years. The loss years are shown in parentheses.

| Year | [1] Amount | Year | [1] Amount |
|---|---|---|---|
| 1948 | ($22, 250. 36) | 1961 | ($9, 656. 15) |
| 1949 | (7, 060. 07) | 1962 | (20, 104. 31) |
| 1950 | (6, 507. 74) | 1963 | (17, 766. 33) |
| 1951 | 5, 605. 55 | 1964 | (11, 660. 53) |
| 1952 | (7, 350. 02) | 1965 | 2, 895. 23 |
| 1953 | (5, 431. 06) | 1966 | (10, 664. 12) |
| 1954 | 5, 241. 56 | 1967 | (9, 757. 20) |
| 1955 | (3, 932. 57) | 1968 | 419. 30 |
| 1956 | (833. 58) | | |
| 1957 | 6, 598. 26 | Total gains | 26, 261. 18 |
| 1958 | (12, 437. 50) | Total losses | 152, 110. 01 |
| 1959 | 5, 501. 28 | | |
| 1960 | (6, 698. 47) | Net total losses | 125, 848. 83 |

[1] These figures were stipulated. We cannot reconcile them with the figures reported as profit or loss from the Hendry farm on the joint income tax returns filed by F. M. and Martha Hendry for the years 1951–67, copies of which are in evidence. Most of these returns reported a net loss from the farm which was offset for the most part against decedent's salary income.

Beginning in about September 1954, the decedent and his family resided in a one-story frame residence located at the Hendry Ranch. During the years 1959 through 1963, the decedent paid a total of $155,923.37 for the construction of a new residence on the ranch. A building permit dated September 27, 1960, for the construction of this new residence lists Capt. F. M. Hendry as the owner. In late 1962 the decedent, his wife, and family moved into this new residence on the ranch and lived there until his death.

A homeowner's insurance policy for the period beginning November 13, 1952, through May 6, 1960, shows F. M. Hendry as the insured with respect to improvements on the ranch. From May 6, 1960, until the policy expired on November 13, 1963, F. M. Hendry and Martha were designated as the insured. Another insurance policy entitled "co-insurance contract" designated the decedent and Martha as the insured for the period beginning November 7, 1961, and ending November 7, 1967, with respect to improvements on the ranch.

Certain funds used in the operation of the Hendry Ranch from 1942 through July 10, 1948, which were derived from the Hendry Corp. were carried on this corporation's books as "F. M. Hendry,

Farm No. 1." In December 1947, this account designation was changed to "F. M. Hendry—Ranch No. 1," and this account remained in existence until 1957 when the balance of the account was transferred to "F. M. Hendry, Salary and Advance."

Some of the funds which were derived from the Hendry Corp. and expended on the ranch between September 1960 and October 1963 were carried on the corporate books as "F. M. Hendry—New Residence." The balance of this account on October 30, 1963, was $30,703.76. As of October 30, 1963, the corporate account entitled "F. M. Hendry, Salary and Advance" contained an outstanding net balance of $184,377.85. The total amount owed by F. M. Hendry to the Hendry Corp. on October 30, 1963, was $215,081.61. Most of these funds owed by Hendry had been expended on the new residence, ranch, and grove located on the Hillsborough County property. F. M. Hendry also maintained a personal ledger which contained an account designated "Ranch—New Residence Construction, Landscaping and Furnishings." The balance in this account on October 30, 1963, was $155,923.37 and the balance increased to $157,485.32 as of January 1, 1966.

On January 12, 1965, an Internal Revenue Service agent completed an audit of the individual income tax returns of F. M. and Martha C. Hendry for taxable years 1960, 1961, 1962, and 1963. An important issue in the case was his determination that the Hendry Corp.'s advances to F. M. Hendry each year were constructive dividends in the years under examination. On October 30, 1963, F. M. Hendry repaid all of the funds that had been previously advanced to him by the corporation. At the district conference between Internal Revenue Service Conferee H. A. Richardson and decedent's representatives, it was agreed that the constructive dividend issue would be conceded by the Government because it was determined that F. M. Hendry had always intended to repay the loans and had in fact done so.

On October 25, 1963, F. M. Hendry and Martha C. Hendry obtained a loan of $180,000 from the First National Bank of Tampa, Tampa, Fla. The proceeds of the loan—$178,081.64—were used to repay most of the loan of $215,081.61 from Hendry Corp. to decedent. Notes evidencing an indebtedness of $37,000 of the Hendry Corp. to Martha C. Hendry were outstanding at the time. Decedent exchanged these notes for his personal note of $37,000. He then gave to the Hendry Corp. the notes evidencing the corporate indebtedness to Martha C. Hendry in return for cancellation of decedent's remaining debt to the corporation. In consideration for the $180,000 loan, F. M. Hendry and Martha C. Hendry executed a note for $180,000 on October 25, 1963, to the First National Bank of Tampa. In conjunction with the loan F. M. Hendry and Martha C. Hendry, his wife, as mortgagors, executed a mortgage on the Hillsborough County property, excluding certain

land on which the new residence was located, to the First National Bank of Tampa, as mortgagee, in the amount of $180,000. There were three extensions to the mortgage dated December 31, 1965, December 29, 1966, and December 26, 1967.

Martha C. Hendry had a personal checking account at the First National Bank of Tampa which she used primarily as a household account. The funds deposited into this account were derived from decedent's personal checking account, except for $60,000 deposited December 12, 1966, by a check from the Equitable Life Assurance Society of the United States. On December 29, 1966, the First National Bank of Tampa charged Martha C. Hendry's account $60,000 as a principal payment on the $180,000 loan, thus reducing the indebtedness to $120,000.

At the time of the decedent's death he and Martha C. Hendry were each personally liable for the entire indebtedness on the loan in the then principal amount of $120,000. A proof of claim for this debt was properly filed in the court administering decedent's estate in accordance with section 733.16, Florida Statutes. Subsequent to decedent's death his estate has paid $20,000 of the principal amount of the loan; $100,000 principal amount of the loan remains outstanding.

On July 15, 1965, decedent and Martha C. Hendry executed a note for $20,000 and received a $20,000 loan from the First National Bank of Tampa. On January 18, 1966, decedent and Martha C. Hendry executed a note for $15,000 and received a $15,000 loan from the First National Bank of Tampa. Security for both loans was Martha C. Hendry's 1,000 shares of the common stock of Alico Land Development Co. and 1,420 shares of the common stock of Seaboard Coastline Railroad. At the time of the decedent's death, Martha and he were each personally liable for the entire indebtedness of both the $20,000 and the $15,000 loans. A proof of claim for these debts was properly filed in the court administering decedent's estate in accordance with section 733.16, Florida Statutes. Subsequent to decedent's death the $15,000 and the $20,000 loan have been repaid in their entirety by the decedent's estate.

On Schedule G, Transfers During Decedent's Life, of the Estate Tax Return for Francis M. Hendry, petitioner did not include the value of the Hendry Ranch. The value of this property and assets as of November 14, 1968, was as follows:

| | |
|---|---:|
| Residence | $65,000 |
| Pastureland of 585 acres | 263,250 |
| Citrus grove of 70 acres | 81,000 |
| Ranch buildings and improvements | 10,000 |
| Cattle and equipment | 50,000 |
| Total | 479,250 |

In his notice of deficiency respondent determined that the value of this property and assets is includable in decedent's gross estate under section 2036, I.R.C. 1954.

On Schedule K, Debts of Decedent, of the Estate Tax Return petitioner included promissory notes to the First National Bank of Tampa dated October 23, 1963, July 15, 1965, and January 18, 1966, in the amounts of $120,000, $20,000, and $15,000, respectively.

Respondent in his notice of deficiency determined that the three notes to the First National Bank of Tampa were items which could be used as an offset against the value of the Hendry Ranch, if it was included in decedent's gross estate, but were not deductible as debts of decedent under section 2053, I.R.C. 1954.

At the time of decedent's death, the cattle herd on the ranch consisted of 190 brood cows, thirty 18-month-old heifers, seventy 9-month-old heifers, and 4 purebred bulls. There was also a substantial amount of farm equipment on the ranch as of November 14, 1968.

On January 1, 1969, Martha sold the agricultural equipment and cattle located on the ranch to her two sons, Harold M. Hendry and Aaron W. Hendry. On January 2, 1969, Martha leased the Hillsborough County property to her sons, Harold and Aaron.

At the suggestion of the estate tax examiner reviewing the decedent's estate tax return, petitioner filed gift tax returns for decedent covering 15 of the years between 1948 and 1968. These returns were dated January 4, 1972. Included among the items reported as gifts on these returns were: The value of the Hillsborough County property as of July 12, 1948; the expenses paid in excess of ranch income for the farm operations on the property for every year expenses exceeded income of the ranch and grove; and the payments made by the decedent for the construction of the new residence. The only gift tax return filed by decedent during this period was for 1965 and this return did not report any of the items reported by petitioner. The gift taxes due on the above returns were not claimed as debts on the estate tax return but were allowed as additional deductions in the notice of deficiency.

Respondent, in his statutory notice dated August 21, 1972, determined that Schedule K—Debts of Decedent—should be decreased by $131,865.73. This item should be reduced by $900 since the gift taxes paid by the petitioner were $55,302.63 in lieu of $54,402.63 for a total of $130,965.73. Certain other issues raised in the notice of deficiency are no longer in controversy since they have been agreed to by the parties. As a result of the settlement of these issues, automatic adjustments must be made to Schedule M—Marital Deduction—and the credit for Federal gift taxes.

Francis M. Hendry retained for his life the possession and enjoyment of, and the right to the income from, the Hendry Ranch which he conveyed to his wife in 1948.

OPINION

On July 10, 1948, the decedent, Francis M. Hendry, conveyed to his wife, Martha, certain property owned by him and known as the Hillsborough County property or the Hendry Ranch. Prior to the transfer, the decedent conducted cattle-raising and citrus-growing operations on this property. Subsequent to the conveyance of the legal title to Martha, the decedent continued to control and operate these cattle and citrus businesses. No perceptible change could be discerned in his relationship to this property from his personal course of conduct subsequent to the transfer. As a result, the respondent determined that decedent had retained an interest in the property for his life which would make it includable in his gross estate under section 2036(a)(1). Petitioner asserts that section 2036(a)(1) does not apply. We agree with respondent.

Section 2036(a)(1) provides:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property * * *

In interpreting this provision, section 20.2036–1(a), Estate Tax Regs., states, in pertinent part:

An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred.

Since we do not believe that there existed an express agreement between the decedent and his wife, we must focus on the question whether there was an implied agreement or understanding between them, at or before the time of the transfer of the Hillsborough County property to Martha, that decedent would continue to treat the property as his own, to use the property for business purposes, and to retain generally the possession, enjoyment, and income therefrom.

The interest retained by the decedent for his life need not be created

by the express terms of the transfer. *Estate of Ethel R. Kerdolff*, 57 T.C. 643 (1972) ; *Estate of Roy D. Barlow*, 55 T.C. 666 (1971) ; *Estate of Daniel McNichol*, 29 T.C. 1179 (1958), affd. 265 F. 2d 667 (C.A. 3, 1959), certiorari denied 361 U.S. 829 (1959). To be includable in the decedent's gross estate, the life interest so retained need not be legally enforceable. *Estate of Ethel R. Kerdolff, supra; Estate of Roy D. Barlow, supra.*

The retained interest of the decedent can arise from an implied understanding between the decedent and the person to whom the transfer was made, *Tubbs* v. *United States*, 472 F.2d 166 (C.A. 5, 1973), certiorari denied 411 U.S. 983 (1973) ; *Gwynn* v. *United States*, 437 F. 2d 1148 (C.A. 4, 1971) ; *Estate of Ethel R. Kerdolff, supra;* sec. 20.2036–1 (a), Estate Tax Regs., and such an agreement or understanding may be inferred from the facts and circumstances of the transfer and the subsequent use of the property. *Skinner's Estate* v. *United States*, 316 F. 2d 517 (C.A. 3, 1963) ; *Estate of Ethel R. Kerdolff, supra; Estate of Roy D. Barlow, supra; Estate of Emil Linderme, Sr.*, 52 T.C. 305 (1969). Since section 2036(a)(1) applies only in situations where the possession or enjoyment of, or the right to income from, the property is retained by the decedent at the time the transfer is made, the circumstances that inferentially establish an agreement must demonstrate that such an understanding occurred contemporaneously with the transfer. *Estate of Roy D. Barlow, supra.*

In a case such as this, particularly where the circumstances imply a prearrangement, the burden of proof is on the petitioner to establish that an implied understanding or arrangement did not in fact exist. *Skinner's Estate* v. *United States, supra; Estate of Ethel R. Kerdolff, supra; Estate of Emil Linderme, Sr., supra.* We realize that this burden requiring the taxpayer to disprove the existence of an intrafamily prearrangement is a heavy one. *Estate of Ethel R. Kerdolff, supra,* and cases cited therein. However, as this Court stated in *Estate of Emil Linderme, Sr., supra,* "such difficulty does not justify exclusion from the operation of section 2036(a)(1)." This section is designed to include in the gross estate of the decedent, all property of decedent which was the subject of an incomplete inter vivos transfer. *Estate of Roy D. Barlow, supra.* The mandate underlying the includability of an interest pursuant to section 2036 (a)(1) is broad. In *Commissioner* v. *Estate of Church*, 335 U.S. 632 (1949), the Supreme Court said at page 645—

an estate tax cannot be avoided by any trust transfer except by a bona fide transfer in which the settlor, absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property. After such a transfer has been made, the settlor must be left with * * * no right to possess or to enjoy the property then or thereafter. * * *

Consequently, we cannot countenance an attempt to circumvent the perimeters of this section by relieving the taxpayer of the burden of negating the existence of an agreement and, concurrently, requiring the respondent to establish that such understanding did exist.

In the present case the petitioner has failed to meet his burden. Additionally, all the attendant facts reveal the existence of an implied understanding between decedent and his wife that the decedent would retain possession and enjoyment of the Hillsborough County property for a period which did not in fact end before his death.

The record clearly shows that the decedent retained and enjoyed nearly all the rights of ownership after the transfer of the property in question. The retention and control of the revenue generated from ranch operations by the decedent is significant in establishing his continued enjoyment of the property. In *McNichol's Estate* v. *Commissioner*, 265 F. 2d 667 (C.A. 3, 1959), certiorari denied 361 U.S. 829 (1959), the Court of Appeals stated at page 671—"one of the most valuable incidents of income-producing real estate is the rent which it yields. He who receives the rent in fact enjoys the property." This Court has also acknowledged that the retention by the decedent of posttransfer revenue or income is indicative of the existence of an implied understanding at the time of the transfer. *Estate of Marie G. Nicol*, 56 T.C. 179 (1971); *Estate of Roy D. Barlow, supra; Estate of Allen D. Gutchess*, 46 T.C. 554 (1966), acq. 1967-1 C.B. 2. The retention of income or revenue from the property by the decedent does not conclusively establish, as a matter of law, that the property is includable in the decedent's gross estate, but rather, constitutes very clear evidence that the decedent did indeed retain "possession or enjoyment." *Estate of Emil Linderme, Sr., supra.*

The decedent continued to control and channel the income from the ranching operations on the Hillsborough County property after the transfer to his wife on July 10, 1948, until his death on November 14, 1968. Most of the revenue from the sale of ranch assets during this posttransfer period were deposited in the decedent's personal checking account. Decedent had complete control over the distribution of these funds. He wrote checks from this account for most of the costs of farm operations or to the Hendry Ranch account which then issued checks to pay ranching costs. Decedent also wrote checks unassociated with the Hillsborough County property from his personal account. Emphasis should be placed on the fact that once the ranch revenues were placed in his personal checking account, the decedent had complete, unrestrained, and autonomous control over the distribution of these funds. This totally unencumbered control is highly indicative of the fact that decedent continued to enjoy or possess the property.

Petitioner argues that the fact that the income from the ranch was deposited in decedent's bank account does not prove that he was entitled to the income from the property, because the expenditures made by decedent on the property greatly exceeded the income. This does not follow, because the control of how the income was spent, and how many additional expenditures were to be made, was entirely in the hands of, and was exercised by, decedent. Decedent operated the property as a business, both before and after the title was transferred to Martha, as indicated by the income tax returns, and petitioner makes no claim that the business belonged to Martha. All of the income produced by the property was produced by the operation of decedent's business and there was no likelihood that the property would produce any other income. Furthermore, there is no evidence that any of the gains which were stipulated to have been received from the agricultural operations of the ranch in some of the years between 1948 and 1968 were turned over to Martha.

From every outward indication, the decedent's relationship to the property was no different after the transfer than before. See *Guynn* v. *United States, supra.* In fact, the subsequent use of the property by the decedent and his conduct toward the property vis-a-vis the transferee may be extremely important in establishing an implied understanding that decedent would retain an interest for his life. There is a plethora of evidence to indicate that the decedent conducted himself and, indeed, thought of himself as the person entitled to possess, control, and enjoy the Hillsborough County property. Although he had conveyed legal title to his wife, the decedent remained the de facto owner.

Besides controlling the revenue generated by the ranch operations, decedent orchestrated all of the agricultural activities. He made all the financial contributions to the operation of and improvements on the property. He purchased the farm equipment and paid the excess expenses over ranch income. Decedent never filed any gift tax returns to show that his personal expenditures on the ranch constituted gifts to his wife.[1] He purchased certain Angus bulls for use in ranch activities and registered these bulls in his own name. He personally leased additional acreage from the State of Florida to increase the grazing area of the ranch. He also constructed a levee with his own funds to prevent flooding of grazing land.

Decedent obtained an employer identification number in his own name. This number was used in connection with farm operations on

---

[1] Gift tax returns were filed by the executor several years after decedent's death. The delinquent gift tax liability reflected on those returns and the penalties thereon have been allowed as deductions for estate tax purposes by respondent.

this property. Additionally, he carried workmen's compensation insurance to protect agricultural employees on the ranch. From 1956 to 1960, the compensation insurance was solely in the decedent's name. From 1960 to 1967, it was in the names of both the decedent and his wife. On his Federal income tax returns for 1961 through 1969, decedent listed himself as an executive and a rancher.

Decedent expended his own money and funds that he borrowed from his corporation on the construction of a new residence on the Hillsborough County property. From 1952 to 1960, decedent was the insured under a homeowner's insurance policy covering the improvements on the Hillsborough County property. On two later homeowner's insurance policies, both the decedent and his wife were listed as the insured.

Finally, Martha C. Hendry, the wife of the decedent, testified that decedent was in a high-risk business, and, therefore, because he wanted to insure that his wife and children would have some security, he took the Hillsborough County property out of his own name. Martha also testified that she never contemplated ejecting her husband from the property. From this testimony, it appears that the decedent merely placed the legal title to the property in his wife's name as a precautionary measure. Both Martha and the decedent realized that after the transfer, he would continue to run the ranch without any changes.

In its briefs petitioner attempts to rationalize the various factors we have mentioned herein as indicia of decedent's retention of rights in the property as not being incompatible or inconsistent with the normal conduct of a husband with respect to his wife's property. Taken individually, many such rationalizations are plausible. But when taken as a whole, we cannot avoid the conviction that decedent and Martha understood and agreed that complete control of the property, including its use and the revenues produced therefrom, were to remain in decedent as long as he lived.

While we have concluded that the property in question must be included in the decedent's gross estate under section 2036(a)(1) because he retained the possession and enjoyment of it for a period which did not in fact end before his death, we are also cognizant of the existence of a certain degree of ambiguity concerning the proper interpretation of the language "for any period which does not in fact end before his death." Certain authority has evolved which has placed a gloss on this provision requiring that the period for which the income was retained be such as to evidence the decedent's intention that the period should extend for at least the duration of his life. *National Bank of Commerce in Memphis* v. *Henslee*, 179 F.Supp. 346 (M.D.Tenn. 1959). However, this Court has pointed out:

The regulations under the 1954 Code do not contain this limitation on the application of the statutory language, and such a limitation is not inherent in the

text of section 2036. [*Estate of Marie J. Nicol*, 56 T.C. 179, 183 (1971), and cases cited therein. Accord, *Estate of Ethel R. Kerdolff, supra.*]

We need not decide which interpretation of the clause should be applied because under either, the ranch is includable in decedent's gross estate. The decedent retained the ranch and income therefrom for an indefinite period and his actions and the testimony of his wife indicate that at the time of the transfer, he intended to continue to operate the ranch in the same manner for the remainder of his life.

In its argument, the petitioner relied very heavily on *Estate of Allen D. Gutchess,* 46 T.C. 554 (1966), acq. 1967–1 C.B. 2. In this case the decedent conveyed his residence to his wife but continued, until his death, to cohabit with her in this house. This Court concluded that the continued posttransfer use of the residence by the husband was a normal consequence of his harmonious marital relationship and the fact of his continued cooccupancy of the house until his death was insufficient, in and of itself, to indicate the existence of an agreement for retained enjoyment or possession.

Petitioner extracted from this case the proposition that the activities of a husband and wife which are characteristic of a normal marital relationship cannot constitute evidence adequate enough to establish that the husband has retained possession or enjoyment of property which he has transferred to his wife. Based on this proposition, petitioner asserts that the continued control and management of the Hendry Ranch by decedent was the normal outgrowth of their marital relationship.

We believe that *Estate of Allen D. Gutchess, supra,* should be carefully confined to its narrow factual situation and that it would be dangerous to abstract broad legal principles from it. The factual pattern in that case is clear and limited. The continued occupancy of the residence by the decedent in no way withheld the right of occupancy from the donee wife. The proof of continued cooccupancy alone was insufficient to establish the decedent's retention of possession and enjoyment. Accord, *Union Planters National Bank* v. *United States,* 238 F. Supp. 883 (W.D. Tenn. 1964); *Stephenson* v. *United States,* 238 F. Supp. 660 (W.D. Va. 1965).

Here, however, the cooccupancy did not occur until about 6 years after the transfer. At the time of the transfer neither decedent nor Martha were living on the ranch. The ranch was being used in decedent's citrus and cattle business and continued to be so used. Martha did not occupy the property until 6 years later. When decedent and Martha actually moved on the property to make it their residence, decedent built the rather expensive house with his own funds and never transferred it to Martha. So the circumstances here were quite different than in *Gutchess.*

Each case concerning a retention of possession or enjoyment by a decedent must stand on its own facts and circumstances.[2] The present situation clearly goes beyond the one faced in *Estate of Allen D. Gutchess, supra.* Here, there are numerous indicia of retention of possession or enjoyment of the ranch by decedent. In *Estate of Allen D. Gutchess, supra,* the decedent merely continued to cooccupy the residence with his spouse and did not exclude her from occupancy and use. The decedent in the instant case continued to retain *exclusively* the revenues from the ranch. We indicated in *Estate of Allen D. Gutchess, supra,* that the retention of posttransfer income from the property by the decedent is substantial evidence that an implied understanding for such retention existed.

Finally, petitioner argues that Fla. Stat. sec. 708.03, which was in force during the years in question and which stated that the property of the wife shall remain in the care and management of the husband is relevant because it offers evidence that it was normal for a husband in Florida to manage his wife's property. This statute was offered to support the claim of the petitioner that the decedent was merely managing the ranch for his wife. We find this statute to be of little help to the petitioner. Even petitioner admits that it does not compel the conclusion that there was no implied agreement. It would be erroneous to assume that because a husband was empowered under Florida law to manage his wife's property, the decedent was following the dictates of that statute. We believe the evidence established that the decedent was running the ranch operations for himself and was not managing it on behalf of his wife.

There is a concomitant but subsidiary issue which we should discuss but need not decide. The petitioner, in the Federal estate tax return of the decedent, claimed deductions allegedly representing debts of the decedent in the amounts of $120,000, $20,000, and $15,000.

On October 23, 1963, the decedent and his wife executed and delivered to the First National Bank of Tampa a promissory note in the principal amount of $180,000. This note was secured by a mortgage on the Hillsborough County property. At the date of the decedent's death, the unpaid principal was $120,000. On July 15, 1965, decedent and his wife received a loan of $20,000 from the same bank and executed a note

---

[2] There is a striking factual similarity between our present situation and the one faced by the District Court in *Bridgforth* v. *United States,*     F. Supp.     (S.D. Miss. 1973). However, certain essential facts in these cases were quite dissimilar, and consequently, we have reached a result totally opposite to the one in *Bridgforth.*

In *Bridgforth,* the decedent conveyed an income-producing property to his wife. The District Court made the factual determination that the decedent did not retain the income but that it was received by his wife. Furthermore, it concluded that the wife remained in possession of the property and the court also apparently accepted the argument that the wife leased the property to her husband. In *Bridgforth,* the wife, with her own funds erected a home for the decedent and herself on the transferred land.

for that amount. Finally, on January 18, 1966, decedent and Martha executed a note for $15,000, and received a loan of $15,000 from the bank. The decedent and his wife were each personally liable on these three notes. Petitioner has claimed a deduction on the estate tax return of the decedent for these debts in the principal amount of $155,-000, alleging that they are deductible under section 2053. Respondent, in his notice of deficiency, determined that these debts were not deductible under section 2053. However, since respondent assumed that the Hillsborough County property was includable in decedent's gross estate, he allowed the $120,000 as a reduction from the value of decedent's interest in the property. Similarly, the respondent concluded that the loans of $20,000 and $15,000 were indirectly used in improvements made on the Hillsborough County property and, therefore, he allowed these amounts as reductions from the value of the property. Since we have established that the Hillsborough County property is includable in the decedent's gross estate, the respondent readily concedes that the outstanding principal on these debts can be used as offsets against the value of decedent's interest in the property. Both parties agree that if we conclude that the value of the ranch property is includable in decedent's estate, no true controversy exists concerning the deductibility of these notes which need be decided in this case, and we refrain from doing so.

*Decision will be entered under Rule 155.*