ESTATE OF ALFRED A. GARNER, DECEASED, WALDO GARNER, ADMINISTRATOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Garner v. Commissioner
Docket No. 16192-80.
United States Tax Court
T.C. Memo 1982-481; 1982 Tax Ct. Memo LEXIS 261; 44 T.C.M. (CCH) 903; T.C.M. (RIA) 82481; August 23, 1982. Forrest Walpole, for the petitioner. Richard A. Witkowski, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in Federal estate tax of the estate of Alfred A. Garner, deceased, Waldo Garner, Administrator, in the amount of $104,900.56. The sole issue for decision is whether all or any part of several farm properties which decedent transferred by gift more than 3 years before the *262 date of his death are includable in his gross estate under section 2036, [1] because decedent retained for his life the possession or enjoyment of, or the right to income from, such properties. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Waldo Garner, administrator of the estate of Alfred A. Garner, deceased, filed a Federal estate tax return with the Internal Revenue Service Center, Cincinnati, Ohio, on September 21, 1977. At the time the petition herein was filed, Waldo Garner resided in Vassar, Michigan. The decedent, Alfred A. Garner (Mr. Garner) died in an automobile crash on December 16, 1976, at the age of 92. At the time of his death, decedent was a resident of Tuscola County, Michigan. Mr. Garner was a widower, his wife having predeceased him on August 7, 1969, and he had no children. Decedent was survived by his six nephews and nieces: Garner Thompson, Waldo Garner (the administrator of decedent's estate), Gladys Wiltse, Lila Phipps, Norma Kienzlen, and Alice Reif. *263 Prior to December 7, 1973, Mr. Garner owned 280 acres of real property in Tuscola County, Michigan. The 280 acres consisted of three 80-acre parcels and one 40-acre parcel. The three 80-acre parcels were used for farming. Decedent's personal residence was located on one of the 80-acre tracts. The same tract also had various structures and other improvements upon it, among which were two huge barns which decedent used for storing harvested crops. The 40-acre parcel was unimproved. It was untillable and consisted only of woods. Mr. Garner, many years prior to 1973, had personally farmed his land on a full-time basis. However, in the late 1930's or 1940's, Mr. Garner retired from farming but leased his land to certain of his nephews and nieces as tenant farmers. Under this tenant farming arrangement, the crops and expenses would be shared equally by Mr. Garner and the tenant; however, the tenant would advance all of the funds for expenses and would be repaid by Mr. Garner for his share of the expenses, usually in the following year when the crops were divided. By the early 1960's, Waldo Garner was the only one of Mr. Garner's nephews and nieces who tenant-farmed Mr. Garner's *264 lands. Waldo Garner and his son, W. Jon Garner, thus farmed all three of the 80-acre tracts on a tenant farming basis. In most instances, the harvested crops, except for corn, would be stored in the two barns located on Mr. Garner's property. This storage capability enabled Mr. Garner to hold on to harvested crops for at least several years or until he felt that the market price was good. This practice of storing crops in Mr. Garner's barns was not followed with respect to corn, since corn, unlike the other crops, required the use of artificial heat in drying prior to storage. Since the heat drying equipment was owned by W. Jon Garner, the son of Waldo Garner, the corn was dried and stored on W. Jon Garner's farm. On many occasions Mr. Garner would permit his nephew to dispose of his share of the crops at the same time the nephew sold his own share, so long as Mr. Garner was satisfied with the proposed selling price. At a family gathering on Christmas Eve in 1972, Mr. Garner announced to his nephews and nieces that he intended to settle up his estate by making gifts of the real property to several of them while he was living and still of sound mind. Mr. Garner, sometime *265 in 1973, went to see an attorney who advised Mr. Garner that he had to make outright gifts of the property without any strings attached or the property would still be included in his estate. As a result of the meeting, the attorney prepared deeds under which Mr. Garner conveyed certain parcels of his property to one of his nephews and three of his nieces. On December 7, 1973, Mr. Garner announced that he was done with piling up money and transferred the 280 acres of land by warranty deeds for $1 each to four of his nieces and nephews. Waldo Garner, Alice Reif, and Norma Kienzlen each received one of the 80-acre tracts. The 80-acre tract which Alice Reif received contained Mr. Garner's personal residence as well as the barns and other structures. Gladys Wiltse received the 40-acre parcel. Mr. Garner filed a gift tax return reflecting the transfer of the 280 acres. Mr. Garner continued to live in the residence located on the 80-acre parcel he had transferred to his niece, Alice Reif, until his death on December 16, 1976. During the years 1974 and 1975, Mr. Garner received the sum of $280 yearly from Mobil Oil Co. for an oil and gas lease covering certain of the acres he had transferred *266 by gift on December 7, 1973. The income tax return filed by Mr. Garner for 1974 contained a Schedule F--Farm Income and Expenses. On the Schedule F, Mr. Garner disclosed as the location and acreage of his farm the same three 80-acre parcels of which he had made gifts on December 7, 1973. The Schedule F, in addition to $280 of income from an oil and gas lease, reported income from crops and accompanying deductions. Included in the deductions claimed was $2,644.89 for taxes, $107 for insurance, and $1,431.38 as an allowance for depreciation. Part III of the Schedule F pertaining to the depreciation showed that $99.11 of this $1,431.38 allowance for depreciation was attributable to a perforated floor which Mr. Garner had acquired in 1974 at a cost of $693.74. The $99.11 computed as the depreciation deduction for the floor was arrived at under the straight-line method after a useful life of 7 years had been assigned to the floor. Other portions of the total $1,431.38 allowance for depreciation were attributable to tiles which Mr. Garner had acquired at various dates, a share in an auto, and also to a bin which he had acquired in 1973. Mr. Garner, on his income tax return for *267 1975, on Schedule E--Supplemental Income Schedule, reported $280 of income from the oil and gas lease. On a Form 4835--Farm Rental Income and Expenses (Crop and Livestock Shares Received by Nonparticipating Landowner (or Sub-lessor)), the return reported Mr. Garner as receiving various amounts of income from crops as well as having accompanying deductions. Included in the deductions claimed were $2,644.89 for taxes, $112.32 for insurance, and $1,181.38 as an allowance for depreciation. On the Form 4835, the lines for information as to the business name, address, location and number of acres in the farm were not filled in. No specification was made of the various properties on which an allowance for depreciation was claimed on the Form 4835. The return only stated that an allowance for depreciation of $1,181.38 was being claimed on various properties acquired at various times having an aggregate cost of $19,902.09. The 1975 income tax return was prepared for Mr. Garner by an accountant. The 1976 income tax return filed by Waldo Garner, administrator of the estate, on behalf of Mr. Garner, the decedent, did not report any farm or farm rental income. The only income reported on *268 the return was the interest which had been earned on various bank accounts. The estate tax examiner assigned to examine the estate tax return noticed that while no real property had been included in Mr. Garner's estate on the estate tax return, Mr. Garner had reported farm income on his 1974 and 1975 income tax returns but no farm income was reported on the 1976 income tax return filed for decedent by the administrator of his estate. In response to questions asked them, the attorney for the estate and one of decedent's nieces told the estate tax examiner that while decedent had given away all the farm property in late 1973, the crops harvested in 1973 were not part of the gifts and that the income reported in 1974 and 1975 was from sales of such harvested crops and that by 1976 all of such 1973 crops had been disposed of. The estate tax examiner requested and received the assistance of a revenue agent for the purpose of verifying the income which Mr. Garner received in 1976. Waldo Garner, as administrator for Mr. Garner's estate, subsequently agreed to adjustments to the 1976 income tax of the decedent, reflecting farm income in the amount of $21,085.41, which income he agreed *269 should have been reported for the 1976 taxable year. This $21,085.41 of agreed-to adjustments consisted, in part, of $12,275.61 from the sale of corn, $7,564.16 from the sale of navy beans, and $2,684.20 from the sale of wheat. Waldo Garner also agreed that a deduction of $1,438.56 for depreciation, which had not been claimed on the 1976 income tax return, should be made.
Waldo Garner did not agree to the inclusion of a check in the amount of $916.95 paid by Michigan Sugar Co. in 1976 for the purchase of sugar beets, as the income of decedent. This check represented payment for beets which had been grown on the 80-acre tract given to decedent's niece, Alice Reif.This check was payable to the order of decedent. W. Jon Garner, Waldo Garner's son, had entered into a contract with the sugar company to sell the beets grown on the property to the sugar company. The contract listed W. Jon Garner as the tenant farmer and the decedent as the owner of the property. The $916.95 check had been received on the day prior to decedent's death. Waldo Garner, subsequent to decedent's death, endorsed the check and gave it to decedent's niece, Alice Reif. Subsequently, a notice of deficiency *270 was issued on July 24, 1980, to the estate of Mr. Garner, Waldo Garner, administrator, for the inclusion of the $916.95 payment from Michigan Sugar Co., in decedent's 1976 taxable income. The total fair market value of the 280 acres as of December 16, 1976, the date of decedent's death, was $435,000. The value of the residence and other structures as of December 16, 1976, was $21,277. The fair market value as of December 16, 1976, of the 40 acres given to Gladys Wiltse was $19,500.
Respondent in his statutory notice of deficiency determined a deficiency in Federal estate tax for the estate in the amount of $104,900.56. The statutory notice contained the following explanatory statements: Schedule G - Transfers During Decedent's Life Item
Description
Returned
Determined
1. (added)
280 Acres of Land
None
$435,000.00
None
Adjustment
$435,000.00
It is determined that the value of 280 acres of land which Legal description is SW 1/ 4 NW 1/4 Section 13, S 1/2 of the NW 1/4 of Section 24, the S 1/2 of the NE 1/4 of Section 23, and the N 1/2 of the NE 1/4 of Section 23 all in Denmark Township, Tuscola County, T12N, R7E located *271 5 miles Southeast of Reese, Michigan is includable in the gross estate since the decedent retained for his life or for any period not ascertainable without reference to his death or for any period which does not, in fact, end before his death the possession or enjoyment of or the right to the income from the property. Accordingly, the taxable estate is increased by the value of the subject property in the amount of $435,000.00 Respondent has subsequently conceded that decedent did not retain a life interest in the 40 acres which he had gifted to Gladys Wiltse, and that the value of such acreage is not includable in his estate. OPINION The sole issue presented is whether the value of the three 80-acre parcels is includable in decedent's gross estate under section 2036. [2]Section 2036 provides in pertinent part as follows: *272 SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE. (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death-- (1) the possession or enjoyment of, or the right to the income from, the property, * * * Section 2036 requires property to be included in a decedent's gross estate if he retained the actual possession or enjoyment thereof, even though he may have had no enforceable right to such possession or enjoyment. Guynn v. United States,437 F.2d 1148 (4th Cir. 1971); Estate of McNichol v. Commissioner,265 F.2d 667 (3d Cir. 1959), affg. 29 T.C. 1179 (1958). *273 As used in the statute, the term "enjoyment" is not a term of art but is synonymous with substantial present economic benefit. United States v. Byrum,408 U.S. 125, 145 (1972); Estate of McNichol v. Commissioner,265 F.2d at 671. The use of the phrase "right to the income" in the statute was not intended to circumscribe the scope of the words "possession" or "enjoyment." Congress added the phrase "the right to the income" only to make it clear that the statute would apply in those situations where a decedent was entitled to income even though he did not actually receive it. H. Rept. No. 708, 1939-1 C.B. (part 2) 457, 490-491, and S. Rept. No. 665, 1939-1 C.B. (part 2) 496, 532. Where decedent has continued to receive the income from the property pursuant to an agreement or understanding between himself and the transferees at the time of the transfer, he clearly has retained the "enjoyment" of the property within the meaning of the statute. Estate of McNichol v. Commissioner,265 F.2d at 670-671. See also United States v. Byrum,408 U.S. at 147-148. *274 Possession or enjoyment of the property is retained when there is an express or implied understanding to that effect at the time of the transfer. Guynn v. United States,supra;Estate of Rapelje v. Commissioner,73 T.C. 82, 86 (1979). In determining whether there was an implied understanding between the parties, all the facts and circumstances surrounding the transfer and the subsequent use of the property must be considered. Estate of Rapelje v. Commissioner,supra at 86; section 20.2036-1(a), Estate Tax Regs. The burden of proof is on petitioner to establish that an implied agreement or understanding did not in fact exist. The burden is especially difficult in a case such as this where all objective evidence implies a pre-arrangement. Further, as we have recognized, the task of disproving the existence of an agreement or understanding between family members is a heavy one. Estate of Hendry v. Commissioner,62 T.C. 861, 872 (1974). Petitioner concedes now *275 that decedent had taken an owner's share in the 1974 and 1975 crops. However, petitioner contends that the property should not be included in decedent's estate because there was no agreement or understanding between decedent and his nephew and nieces at the time of the transfer. In support of this contention, petitioner at trial offered the testimony of two witnesses, a nephew and a niece of decedent each of whom had been a recipient of an 80-acre parcel of land from decedent. Each witness testified that there had been no agreement or understanding with decedent at the time of the transfer; that at the time they had each fully expected to get the owner's share of crops grown on their respective parcels. Decedent's niece testified that, while decedent expressed a desire to continue living in the home located on the 80-acre parcel he had given to her, he stated that he would pay her rent by way of paying the taxes and insurance on the property. Waldo Garner, decedent's nephew and the administrator of his estate, testified that after he and decedent had left the attorney's office after the execution of the deeds, decedent said, "Well, you can set me right out into the road, can't you? *276 " Both witnesses stated that it was only subsequent to the transfer, after decedent decided he would need more money in order to give equivalent cash amounts to his other nephew and niece who had received no gifts of land on December 7, 1973, that he took the crops. It is respondent's contention that, notwithstanding the testimony offered by petitioner, the record shows the existence of an agreement or understanding between decedent and his nephew and nieces at the time of the transfer. We find that there was an implied agreement or understanding at the time of the transfer. Petitioner concedes that decedent received an owner's share in the crops harvested on each of the three 80-acre parcels. Further, it is undisputed that decedent continued to stay in the home located on one of the 80-acre parcels until his death. In weighing the evidence presented, we find the testimony offered by petitioner that there was no agreement or understanding with respect to decedent's retention of the crops, not to be believable. This testimony is strongly contradicted by the other evidence of record as well as by the representations made on behalf of petitioner to the estate tax agent. Decedent *277 on his 1974 and 1975 tax returns not only reported income from crops but also claimed depreciation on the property. The 1974 return further discloses that one of the items upon which depreciation was claimed was an item of property which decedent acquired in 1974, after the date of the transfer. The administrator of the estate admitted that decedent also had income from crops in 1976 as well as in 1974 and 1975. These facts alone are clear evidence of the existence of an agreement or understanding. Estate of Hendry v. Commissioner,supra at 873-874; Tubbs v. United States,348 F.Supp. 1404 (N.D. Tex. 1972), affd. 472 F.2d 166 (5th Cir. 1973). Additionally, the attorney representing the estate and one of decedent's nieces related a version of the facts to the estate tax examiner prior to the trial of this case that is totally at odds with the version put forward by petitioner at the trial. We find that decedent did retain for his life the possession and enjoyment of all of the three 80-acre parcels of farmland. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue.↩
2. Counsel for petitioner in his opening statement at trial alternatively contended that, assuming the retention of a life interest, by 1976 decedent had relinquished such interest so as to cause the property not to be includable in his estate. See Estate of Cuddihy v. Commissioner,32 T.C. 1171, 1176 (1959), and Estate of Stubblefield v. Commissioner,T.C. Memo. 1981-353. See further United States v. Allen,293 F.2d 916↩ (10th Cir. 1961). However, petitioner on brief has not pursued this issue which was raised at trial and we deem this contention to have been abandoned and consequently will not address it. However, it is noted that the administrator of decedent's estate agreed to the inclusion of $21,085.41 of farm income in the income of the decedent for the year 1976.