ESTATE OF LYDIA G. MAXWELL, DECEASED, THE FIRST NATIONAL BANK OF LONG ISLAND AND VICTOR C. MCCUAIG, JR., EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11568-90.          Filed May 13, 1992.

*James M. Marrin* and *Jed C. Albert,* for petitioner.
*Diane R. Mirabito,* for respondent.

OPINION

RAUM, *Judge:* The Commissioner determined a deficiency in estate tax against the estate of Lydia G. Maxwell (decedent) in the amount of $141,991. Decedent was born on June 2, 1902, and resided in Old Brookville, New York, at the time of her death on July 30, 1986. At the time the petition was filed, First National Bank of Long Island had its legal address in Woodbury, New York, and Victor C. McCuaig, Jr., had his legal address in Glen Cove, New York. The case was submitted on the basis of a stipulation of facts and exhibits. The parties have stipulated to the resolution of some of the issues raised in the petition. The issue remaining for decision is whether the property occupied by decedent as her residence at

the time of her death must be included in her gross estate by reason of section 2036(a).[1]

On January 16, 1957, decedent's husband, Ernest Mackenzie Maxwell, purchased the subject property, which consisted of 2 acres of landscaped level land and a house with an attached two-car garage that was reached by a blacktop driveway. The property (referred to sometimes hereinafter simply as the house or home or residence or the property) was located in the village of Old Brookville, town of Oyster Bay, Nassau County, New York State. Mr. Maxwell died testate on July 17, 1978, and the house passed to decedent under her husband's will. On March 14, 1984, decedent executed an indenture conveying her residence to her son, Winslow Maxwell, and his wife, Margaret Jane Maxwell (hereinafter sometimes the Maxwells). The transaction purportedly took the form of a sale for $270,000,[2] with a $250,000 mortgage[3] executed by the Maxwells to the decedent as security for their indebtedness in that amount. At the same time, decedent forgave the Maxwells' obligation in respect of the remaining $20,000. As will appear more fully hereinafter, the Maxwells never made any payments credited towards the principal of the mortgage, which was reduced only by decedent's forgiveness of $20,000 each year thereafter until her death, and by the testamentary forgiveness of the balance at her death.

On March 14, 1985, decedent forgave $20,000 of the principal balance on the mortgage executed by the Maxwells, and

---

[1] All section references are to the Internal Revenue Code in effect at the time of decedent's death. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] The record is unsatisfactory as to this $270,000 figure. The parties have stipulated that decedent obtained an appraisal of the property from Douglas Elliman, real estate brokers, dated Dec. 16, 1983, estimating the market value at $280,000. Respondent accepts that appraisal as the fair market value of the property, but petitioner takes the position that decedent and the Maxwells agreed that the fair market value on Mar. 14, 1984, was $270,000 "after allowing for the fact that a real estate broker generally makes an allowance for a brokerage commission in giving an appraisal". But there is nothing in the record to show either that such was the practice of brokers generally, or that Douglas Elliman took any such factor into account, or what the amount of any such hypothetical commission would have been. Nor has petitioner presented any authority to justify reduction of the fair market value by an amount relating to such commission, particularly where, as here, no broker was involved in the transaction.

[3] Unless otherwise indicated, the usage of such terms as "sale", "mortgage", "interest", "lease", "rent", etc., does not mean that we accept them as correctly describing the legal consequence of what is identified. We are still faced with the task of determining the substance of the transaction regardless of the form used. Also, the parties have at times loosely used the term "mortgage" to refer to "mortgage note", and we have followed that practice here, leaving the meaning to be ascertained from the context.

the Maxwells issued a new mortgage note dated March 14, 1985, in the principal amount of $230,000. The mortgage note given in 1984 as well as the one in 1985 called for the monthly payment of interest, computed at the rate of 9 percent per annum. On January 15, 1986, decedent forgave the Maxwells another $20,000 on their obligation, but there is no evidence that the Maxwells ever executed any similar new note reflecting that forgiveness.[4]

The parties have stipulated that "Beginning on April 15, 1984, Winslow Maxwell made monthly payments by check to decedent which represented interest due on the balance of the mortgage at nine percent pursuant to the terms of the mortgage note." Despite the "forgiveness" of $20,000 of principal on January 15, 1986, which would appear to have reduced the balance of the mortgage note from $230,000 to $210,000, Winslow's payments of interest for February and March continued to reflect interest at 9 percent on the old balance of $230,000. The record does not indicate what, if any, interest payments were made during the months of April, May, or June in 1986. In her will dated March 16, 1984, 2 days after the purported sale of the property to the Maxwells, decedent inserted a provision that forgave and canceled the mortgage indebtedness. This provision was retained in all subsequent wills, including her last will, dated July 3, 1986. In March 1984, when decedent conveyed her house to the Maxwells, she signed a lease as a tenant of the house. The agreement provided that the "lease date" was "March 1984", and that the term was 5 years, beginning "March 1984" and ending "March 1989". The monthly rent was $1,800. Decedent was not required to provide a security deposit. She occupied the house from March 14, 1984, until her death on July 30, 1986. Decedent paid the Maxwells monthly rental payments of $1,800 every month until her death. There is no evidence that petitioner-estate made any rental payments thereafter notwithstanding a provision in the lease making it "binding on all parties who lawfully succeed to the rights or take the place of the Landlord or Tenant." In fact, the record shows that as reported by the Maxwells in their 1986 Federal income tax

---

[4]As will appear hereinafter, petitioner did include a "mortgage note" in the amount of $210,000 as an asset of the decedent in the estate tax return.

returns, they received $12,600 rentals in respect of the property—only the amount due from decedent for the first 7 months of that year, until her death on July 30, 1986. Nor does the record show that the Maxwells ever requested petitioner to pay any such rentals thereafter.

The lease described certain expenses that each party to it was required to bear. Thus, as tenant, decedent was required to "pay for the following utilities and services when billed: gas, water, electric, fuel, telephone, gardening, exterminating and ordinary maintenance expenses." The Maxwells, as "Landlord", were required to "pay taxes, * * * and expenses incurred for structural repairs if necessary." Decedent was required to keep the premises in good order and repair, but was "not responsible for ordinary wear and damage by the elements." Decedent was also required to "keep the grounds neat and clean." The lease required the Maxwells to pay for "insurance, [except contents insurance]" and the parties have stipulated accordingly that "Decedent was to pay for personalty coverage." However, the record does not show that any change was made in respect of the insurance on the real property continued to be carried by the decedent in her own name, apart from a request dated March 20, 1984, that the Maxwells be added "as an additional insured (co-owner)". A communication dated March 5, 1985, from the insurance broker to decedent stated that "since your son and daughter-in-law are listed as an additional named insured it is not necessary to amend the policy further."

On April 24, 1984, Victor C. McCuaig, Jr., wrote to the Nassau County department of assessments and requested it to send all future real property tax bills relating to the house to Winslow Maxwell at his residence in New York City. Included in the record are copies of tax receipts and checks for payment of school, village, and town taxes for the house showing payment by the Maxwells.

The following schedule shows the rentals received by the Maxwells from decedent and the expenses reported, depreciation claimed, and net loss deduction claimed by them in respect of the property on their Federal income tax returns for 1984, 1985, and 1986:

|  | 1984 | 1985 | 1986 |
|---|---|---|---|
| Rentals | $16,200 | [1]$22,183 | $12,600 |
| Expenses |  |  |  |
| Insurance | - - - | 1,178 | 542 |
| Interest | 16,875 | 21,150 | 11,475 |
| Taxes | 2,892 | 7,089 | 2,833 |
| Other | 36 | 29 | - - - |
| Total | 19,803 | 29,446 | 14,850 |
| Depreciation | 22,000 | 24,200 | 18,150 |
| Total | 41,803 | 53,646 | 33,000 |
| Net income |  |  |  |
| or (loss) | (25,603) | (31,463) | (20,400) |

[1]This amount exceeds by $583 the rent that decedent was stipulated to have paid in 1985, i.e., $1,800 a month. There is no explanation for this discrepancy.

Decedent reported the sale of her house on her 1984 income tax return, but she paid no tax on the gain in view of her election to use the one-time exemption of gain allowed by section 121 on the sale of a principal residence. She also reported on that return $16,875 as interest received from her son, Winslow Maxwell. The record does not contain any evidence whether interest from the Maxwells was reported in her returns for 1985 and the short year 1986 ending with her death on July 30, 1986.

Decedent was almost 82-years old when she transferred her home to her son and daughter-in-law. The record does not show that she had any other children, at least at that time. Petitioner's opening brief indicates that decedent's son Winslow was her "only heir". She was then aware that she had cancer and had been operated on for cancer 25 years earlier. Although the parties have stipulated that on the date of the transfer, March 14, 1984, "her cancer was in remission", the record is silent as to the nature or duration of such "remission", her general state of health, or her knowledge of the likelihood of the further reemergence of her cancer or its spread.

Decedent continued to occupy the premises in issue after the March 14, 1984, transfer until the date of her death on July 30, 1986. The Maxwells never occupied the premises, or attempted to rent the property to anyone other than decedent. They made no attempt to sell the property before renting to decedent. Nor did they make any attempt to sell it thereafter

until her death. Shortly after her death they entered into a contract, on September 22, 1986, to sell the property for $550,000 to Vito and Aurora Massaro, persons not shown to be related to the Maxwell family. The sale itself did not take place until December 10, 1986. The parties herein have stipulated that the fair market value of the property as of July 30, 1986, the date of Winslow's mother's death, was $550,000.

In the estate tax return, petitioner did not report the property as an asset of the estate or as representing a transfer during decedent's life includable under section 2036 or any other section. However, it reported as an asset of the estate a mortgage note of the Maxwells in respect of the property in the amount of $210,000, an amount that reflected decedent's final lifetime forgiveness of $20,000 a year on the mortgage obligation.

In the notice of deficiency, the Commissioner determined that—

The transfer of the premises known as 8 Oak Lane, Old Brookville, New York 11545 by the decedent to Winslow Maxwell and his wife, Margaret Jane Maxwell on March 14, 1984 is not recognized for federal estate tax purposes. Accordingly, the fair market value of said premises at the date of death, $550,000.00, is includable in the taxable estate under Sections 2033 and/or 2036 of the Internal Revenue Code.

The notice of deficiency also stated that if "the transfer of the decedent's residence is not to be afforded recognition for federal estate tax purposes * * * then * * * the market value of the 'mortgage note' of $210,000.00 * * * is to be eliminated from the taxable estate." We uphold the determination of the Commissioner.

Although the notice mentioned section 2033, the Commissioner refers to that section only once on brief, and relies instead almost exclusively on section 2036. Similarly, petitioners have treated section 2036 as presenting the only matter in controversy between the parties. We do the same. Section 2033 and relevant portions of section 2036 appear in the margin.[5]

---

[5]SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST.

The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death.

\* \* \* \* \* \* \*

To the extent relevant, section 2036(a) provides in effect that if a decedent has made a transfer of property (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), under which the decedent retains until death the possession or enjoyment of the property, the value of the entire property will be included in the decedent's gross estate.

In form, decedent made a transfer that superficially escapes the provisions of section 2036(a). However, we must look to the substance of what occurred rather than the forms used, and, indeed, in the preamble to the "First Stipulation For Trial", the parties have agreed that "Nothing herein precludes the Court from determining the substance of the transactions described herein or their legal characterizations." On this record, bearing in mind petitioner's burden of proof, we hold that, notwithstanding its form, the substance of the transaction calls for the conclusion that decedent made a transfer to her son and daughter-in-law with the understanding, at least implied, that she would continue to reside in her home until her death, that the transfer was not a bona fide sale for an adequate and full consideration in money or money's worth, and that the lease represented nothing more than an attempt to add color to the characterization of the transaction as a bona fide sale.

Preliminarily, we note that in *Estate of Rapelje v. Commissioner,* 73 T.C. 82, 86 (1979), this Court stated that section 2036(a) "requires property to be included in the decedent's estate if he retained the actual possession or enjoyment thereof, even though he may have had no enforceable right to do so", and that an express or implied understanding between the parties at the time of transfer is sufficient. Moreover, *Estate of Rapelje* emphasized that:

---

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death—

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

The burden is on the petitioner to disprove the existence of any implied agreement or understanding, and that burden is particularly onerous when intrafamily arrangements are involved. *Skinner's Estate v. United States,* 316 F.2d 517, 520 (3d Cir. 1963); *Estate of Hendry v. Commissioner, supra* at 872; *Estate of Kerdolff v. Commissioner,* 57 T.C. 643, 648 (1972). [*Estate of Rapelje v. Commissioner, supra* at 86; fn. ref. omitted.]

The fact that the case was submitted fully stipulated does not relieve petitioner of its burden of proof. *Borchers v. Commissioner,* 95 T.C. 82, 91 (1990), affd. 943 F.2d 22 (8th Cir. 1991).

Here, the transaction was basically between decedent and Winslow Maxwell, her only heir, the natural object of her bounty. The closeness of that relationship in this case is exemplified by the fact that to the extent that Winslow and his wife may have been liable on the mortgage note, decedent periodically relieved them of a portion of such liability and ultimately canceled the remainder by will. Petitioner's burden of proof is significant here, particularly in light of decedent's age and medical condition, as well as her relationship to her only son and heir. She was then nearly 82 years of age, and the condition of her health is only skimpily revealed by the record. The record does disclose that she had had a cancer operation 25 years earlier and that the cancer was in "remission". But it fails to disclose the nature of the "remission", its duration, the prognosis relating to its reemergence, or its spread throughout the body. In the absence of any clarifying evidence in the record, we must conclude that both decedent and her son had reason for concern. Considering her age and health it seems not unlikely that the parties to the transaction viewed her remaining life span as not exceeding the 5-year term of the lease. There is nothing in the record to suggest the contrary.

Again, emphasizing the burden of proof, we are fully satisfied on the record before us that in substance what we have here is simply a transfer by decedent retaining the right, either by express or implied understanding, to the possession and enjoyment of the property until death. The "lease" was signed at the same time or substantially the same time that the property was "sold".[6] The "sale" and "leaseback" were

---

[6]The date of sale was Mar. 14, 1984, and the lease was dated simply "March 1984". But the inference is irresistible that both were entered into simultaneously as part of the plan.

merely components of a single, integrated transaction having very little substance that in reality amounted basically to a transfer of decedent's home to her son and daughter-in-law, retaining the right by agreement, express or implied, to remain in possession for the remainder of her life.

To be sure, as appears from the record, there were some dollar differences between the amounts of "rent" paid by decedent and the amounts of "interest" she received from her son and daughter-in-law. But such differences, although significant if the transaction had been conducted at arm's length between strangers, were comparatively minor and inconsequential here in view of the close family relationship between decedent and her son and only heir. After the "sale" and "leaseback", the economic situation of the parties thereto was not meaningfully changed, taking into account their close family relationship.

We now deal with the question whether the transfer, even if considered separately, qualified under section 2036(a) as a "bona fide sale for an adequate and full consideration in money or money's worth". The answer on this record is that it definitely did not. Even assuming that the value of the property was $270,000 rather than $280,000, see *supra* note 2, decedent never received, nor did any of the parties to the transaction ever intend that she receive, the sales price of $270,000 in money or money's worth in exchange for the property.

A portion of the $270,000 purported purchase price of the house consisted of the $20,000 that decedent "forgave" on the same day she conveyed the house to the Maxwells. The record contains no evidence that the Maxwells agreed to pay or were legally bound to pay this $20,000 to decedent. Indeed, the only evidence at all regarding this amount is the ambiguous and confusing stipulation that decedent "forgave" it. In the absence of any clear and direct evidence that there existed an obligation or indebtedness capable of being forgiven, we hold that the $20,000 portion of the purchase price that decedent purportedly forgave on March 14, 1984, had no economic substance and did not constitute consideration for decedent's home. Thus, the only possible consideration in "money or money's worth" that decedent could have received for the transfer of her home was the "mortgage note" in the amount of $250,000.

Regardless of whether the $250,000 mortgage note might otherwise qualify as "adequate and full consideration in money or money's worth" for a $270,000 or $280,000 house, the mortgage note here had no value at all if there was no intention that it would ever be paid. The conduct of decedent and the Maxwells strongly suggests that neither party intended the Maxwells to pay any part of the principal of either the original note or any successor note. The term of the "mortgage note" executed by the Maxwells on the day of the conveyance was for 1 year, with no payments of principal due during that year. On the due date of the note, decedent forgave $20,000 of the principal, and the Maxwells issued another "mortgage note" in the principal amount of $230,000 with a 1-year term. On January 15, 1986, before payment of this second note was due, decedent again forgave $20,000 of the principal balance. By treating the $20,000 forgiveness as a gift of $10,000 each to Winslow and his wife and assuming that decedent made no other gifts to either of them during the year, each of the forgivenesses of $20,000 of "indebtedness" was the largest amount that could be forgiven without exceeding the present interest gift exclusion provided by section 2503(b). In our judgment, the conduct of decedent and the Maxwells with respect to the principal balance of the note, when viewed in connection with the initial "forgiveness" of $20,000 of the purported purchase price, strongly suggests the existence of an understanding between decedent and the Maxwells that decedent would forgive $20,000 each year thereafter until her death, when the balance would be forgiven by decedent's will. Petitioner has not pointed to anything in the record that negates the existence of such an understanding. Decedent's will that first contained this provision was dated March 16, 1984, 2 days after the date of the conveyance of the property to her son and daughter-in-law, and this provision was contained in all of her subsequent wills including her last will, dated July 3, 1986. Decedent's son and daughter-in-law never in fact paid any part of the principal of the purchase price or of the mortgage note or any successor mortgage note.

Taken singly, none of these facts may be determinative of the parties' intent with respect to the mortgage note. But viewed as a whole, they leave the unmistakable impression that regardless of how long decedent lived following the

transfer of her house, the entire principal balance of the mortgage note would be forgiven, and the Maxwells would not be required to pay any of such principal. See *Deal v. Commissioner,* 29 T.C. 730, 736 (1958). To be sure, decedent may not have been legally obligated to forgive $20,000 of principal every year, or to forgive the entire principal balance in her will. But an understanding between family members that a purported obligation will not be honored need not be legally enforceable, provided the parties adhere to the understanding. Cf. *McNichol's Estate v. Commissioner,* 265 F.2d 667, 670, 673 (3d Cir. 1959), affg. 29 T.C. 1179 (1958). Moreover, it has been held in other contexts that a stated obligation to pay a fixed sum of money may be disregarded as having no value where the facts show that the parties did not contemplate that the obligation would be met. See *Tolwinsky v. Commissioner,* 86 T.C. 1009, 1057 (1986); *Waddell v. Commissioner,* 86 T.C. 848, 902-903 (1986), affd. 841 F.2d 264 (9th Cir. 1988). We hold that the parties did not intend that the Maxwells would ever pay the mortgage note, that it did not have any value, and that it certainly did not represent "adequate and full consideration in money or money's worth" for the property.

The execution of the lease hardly changes our conclusion as to the applicability of section 2036(a). The rental payments by the decedent called for by the lease were approximately equal to the interest required to be paid by the Maxwells. Although, as we have noted earlier in this opinion, the difference could well be significant in the case of a transaction between parties acting at arm's length, it is of little consequence here where the parties were basically the mother and her son, the natural object of her bounty.[7] Moreover, there is no suggestion that Winslow Maxwell would have been a party to any action to have his mother evicted from her home even if she had failed for whatever reason to pay the rent.

Furthermore, in certain other respects the conduct of the parties differed from what would be expected if the lease were truly a bona fide arrangement. Thus, the Maxwells were

---

[7]As a consequence of the transaction, decedent's son and daughter-in-law were able to claim deductions on their income tax returns including substantial depreciation deductions that were previously not available to decedent. Such deductions result in substantial net losses that reduced their otherwise taxable income. We do not pass upon whether such loss deductions were properly allowable.

added to decedent's insurance on the property merely as "co-owners". Moreover, notwithstanding a provision in the lease that specifically made the lease binding on successors, there is no evidence that petitioner paid any rent to the Maxwells for the period of some 5 months after decedent's death until the actual sale of the property in December 1986.[8] Had this been a bona fide lease, it could hardly be imagined that the landlord would not have been paid, or at least demanded, the rent for such subsequent period. In our judgment, the lease was merely window dressing.

The case principally relied upon by petitioner is *Estate of Barlow v. Commissioner*, 55 T.C. 666 (1971). To be sure, that case is superficially similar to the present case. But we must decide this case on the record before us, taking into account petitioner's burden of proof. On this record, we reach the opposite conclusion. Among other things, we note that the Court in *Barlow* emphasized that a "fair rent" was paid by decedent. In the present case, there is no evidence whatever as to whether the rental payments constituted "fair rent". However, we mention this merely as one factor. The point is that we decide this case on the entire record.

Because decedent transferred her house to the Maxwells without an adequate and full consideration in money or money's worth, and retained the possession and enjoyment of the house until her death, the value of the house as of the day she died must be included in her estate under section 2036(a). We have considered various other contentions made by the parties, but have found it unnecessary to discuss them. In order to reflect our conclusions as well as the stipulation of the parties,

*Decision will be entered under Rule 155.*

---

[8]Indeed, there is affirmative evidence that the Maxwells did not receive any rent after the July payment, since their 1986 income tax returns reported rent from this property in an amount equal to 7 months' rent, obviously covering the period January through July. See *supra* pp. 597-598.