T.C. Memo. 2004-39


UNITED STATES TAX COURT


ESTATE OF IDA ABRAHAM, DECEASED, DONNA M. CAWLEY AND DIANA A.
SLATER, ADMINISTRATRIXES, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7071-01.              Filed February 18, 2004.


Brendan J. Shea, for petitioner.

Carina J. Campobasso, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, Judge:  The Estate of Ida Abraham (the estate) seeks a
redetermination of respondent's deficiency determination of an
estate tax of $1,125,210.  The sole question presented is whether
the full date of death value of three family limited partnerships
is includable in the taxable estate of Ida Abraham (decedent)

under section 2036.[1]  Respondent concedes that decedent received
$320,000 in connection with the transfer of certain limited
partnership interests to her daughters, an amount which
constitutes consideration within the meaning of section 2043.
Additionally, respondent concedes adjustments made in the notice
of deficiency for adjusted taxable gifts in the amount of $71,195
and an aggregate gift tax payable in the amount of $29,142.
Because of respondent's concessions, a Rule 155 computation will
be necessary.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.
The stipulation of facts and the attached exhibits are
incorporated herein by this reference.  At the time of filing the
petition, the administratrixes, Donna M. Cawley and Diana A.
Slater, resided in Massachusetts.

Background

Decedent and her husband, Nicholas Abraham (Mr. Abraham,
Sr.), had four children:  Nicholas A. Abraham, Richard Abraham,
Donna Cawley, and Diana Slater.  Mr. Abraham, Sr., died on June
5, 1991, leaving significant assets to his wife.  Of his nearly
$7 million estate, $4,168,885.37 is reported as passing to

---

[1]All section references are to the Internal Revenue Code in
effect as of the date of decedent's death, and unless otherwise
indicated all Rule references are to the Tax Court Rules of
Practice and Procedure.

decedent on Schedule M, Bequests, etc., to Surviving Spouse, on his Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return. Among those assets bequeathed to decedent were the following: (1) Real properties consisting of ice and roller skating rinks collectively known as the Tyngsboro property; (2) the real property known as the Walpole property, which was comprised of a lumber yard; and (3) the real property known as the Smithfield property, which also had an ice skating rink. Mr. Abraham, Sr.'s will was contested, and the family entered into an agreement to compromise his will, which the probate court accepted.[2]

On March 10, 1993, decedent was placed under a guardianship in a proceeding docketed as In re: Guardianship of Ida Abraham, Docket No. 92P 0589 in the Commonwealth of Massachusetts Probate and Family Court.[3] At some point, Mr. Peter F. Zupcofska, Esq., was appointed guardian ad litem for decedent. On June 22, 1993, the probate court appointed Ms. Cawley and Mr. Ira A. Nagel as permanent guardians of the property and estate of decedent.[4] On

---

[2]At some point between the filing of the petition in this case and the execution of the stipulation of facts, decedent's son, Mr. Nicholas A. Abraham, decided to forgo any interest he had in his mother's estate.

[3]Apparently, decedent suffered from the effects of Alzheimer's disease.

[4]The appointment of guardians was in accordance with the terms of Mr. Abraham, Sr.'s compromised will.

or about November 3, 1993, Ms. Cawley and Mr. Nagel petitioned the probate court for authority to "make gifts from funds not needed for the * * * [decedent's] own maintenance and support to and/or in trust for the benefit of each of the * * * [decedent's] children and grandchildren and the spouses of her children." The reason for the gifting powers was, inter alia, that decedent's estate "is likely to be subject at her death to * * * taxes at the highest marginal tax rates then in effect." On December 30, 1993, the probate court signed a decree authorizing decedent's coguardians to make gifts.

On June 13, 1994, decedent's children, their respective counsel, as well as decedent's legal guardians and representatives agreed to a stipulation and agreement for entry of decree to petition to establish an estate plan for decedent (the decree) regarding decedent's guardianship in Docket No. 92P 0589.[5] The decree contemplated, inter alia, the following actions to be performed on behalf of decedent:

1. The Walpole and the Smithfield properties were to be placed in a family limited partnership (FLP) of which decedent was to become the general and a limited partner. Mr. Richard Abraham was to become a 30-percent limited partner in exchange

---

[5]Decedent's children, their respective counsel, and decedent's representatives signed the decree on Aug. 1, 1995.

for the settlement of his claims against decedent's estate. The decree included the following agreement:

> Richard [Abraham] shall receive income from said family limited partnership as follows: either as the management fee and/or gifts from Ida Abraham after deducting from the gross income of the partnership all fees, taxes, partnership administrative expenses, reserve for expenses and monies needed in the discretion of the limited Guardian ad litem (as hereinafter defined) for Ida Abraham's support.

2. Likewise, decedent was to be the general and a limited partner of two FLPs, and each daughter, Ms. Cawley and Ms. Slater, was to be a limited partner therein in exchange for her payment of $160,000. Each of these FLPs was to hold a 50-percent interest in the Tyngsboro property. The decree included the following agreement:

> Donna [Cawley] and Diana [Slater] shall receive income from their family limited partnership as follows: either as the management fee and/or gifts from Ida Abraham after deducting from the gross income of the partnership all fees, taxes, partnership administration expenses, reserve for expenses and monies needed in the discretion of the limited Guardian ad litem for Ida Abraham's support.

3. "The partnerships of the siblings, Richard, Donna, and Diana shall share equally any and all costs and expenses related to the 'Ozdemir suit', the Bloom potential action, and the support of Ida Abraham insofar as the funds generated by Ida Abraham's properties maintained by her do not provide sufficient funds for her adequate health, safety, welfare and comfort as determined by the limited Guardian ad litem".

4.  Mr. David Goldman, Esq. (hereinafter sometimes referred to as the limited guardian ad litem), was to act as a limited guardian ad litem for the benefit of decedent "with regard to her general and limited partnership interests in each of the three" FLPs.  Furthermore,

> Mr. Goldman shall have the right to meet with the guardians of the person and the estate of Ida Abraham in order to ascertain her needs to determine any and all shortfall as between the funds generated by Ida Abraham's segregated property and the income required of her from each of the separate limited partnerships.

5.  Gifts of limited partnership interests in amounts not to exceed the annual gift exclusion amount "shall be made as expeditiously as possible" to decedent's children, their spouses, and her grandchildren.

6.  Each of decedent's children had the right to purchase additional units from each of their respective FLPs, the proceeds from which were to be held in a revocable trust for the benefit of decedent during her life for her needs "(only if her other assets are insufficient to do so)" and then held for such child and his or her family upon decedent's death.

7.  Decedent's living arrangement "shall remain in accordance with the present arrangement and every effort will be made to maintain her in 'status quo'.  Her segregated assets shall be maintained at a level established by the limited Guardian <u>ad</u> <u>litem</u> in his sole discretion."

8.  Mr. Richard Abraham, Ms. Cawley, and Ms. Slater shall share "pro rata" all gift and estate tax liabilities of decedent.

Decedent's estate plan evolved in numerous steps and employed the use of many entities:[6]

(1) Three separate real estate trusts were formed to hold the real property interests:[7]  (a) The DAC Tyngsboro Real Estate Trust was formed on October 1, 1995, naming Ms. Cawley as trustee, and on October 6, 1995, that trust was deeded a one-half, undivided interest in the Tyngsboro property; (b) the RMA Walpole Real Estate Trust was formed on October 1, 1995, naming Mr. Richard Abraham as trustee, and on that day that trust was deeded the Walpole property;[8] and (c) the DAS Real Estate Trust was formed on October 1, 1995, naming Ms. Slater as trustee, and on October 6, 1995, that trust was deeded a one-half, undivided interest in the Tyngsboro property.[9]  On the date that the Tyngsboro property was transferred to the DAS and the DAC real

---

[6]Decedent's estate plan, which benefited Mr. Richard Abraham, differed slightly from those of Ms. Cawley's and Ms. Slater's, and where relevant, we shall indicate any substantive differences.  However, most of the terms in the documents which created the entities/structures herein discussed are substantially similar.

[7]The parties stipulated that certain real properties were "placed" in the FLPs.

[8]As discussed infra, the Smithfield property was deeded to an FLP.

[9]Decedent, through her coguardians, deeded the properties to the real estate trusts.

estate trusts, the property had a total value of $1.8 million or $900,000 to each trust. According to an analysis that Mr. Michael Lipof, an appraiser, performed, the Walpole property had a value of $550,000 as of December 31, 1995. At the time that the aforementioned properties were transferred, they were all subject to long-term leases with independent third parties.

(2) Each of the aforementioned real estate trusts had as its 100-percent beneficiary a separate FLP. In October 1995, the following FLPs were formed: The RMA Smithfield/Walpole Family Limited Partnership (RMA FLP), the DAC Tyngsboro Family Limited Partnership (DAC FLP), and the DAS Tyngsboro Family Limited Partnership (DAS FLP). On October 6, 1995, the Smithfield property was deeded to the RMA FLP.[10] The stated purpose of the FLPs was to "acquire, own, hold, sell, invest, reinvest and otherwise deal with the Property and any other investments." Under the FLP agreements "all income, deductions, profits, losses and credits shall be allocated among the Partners in proportion to their respective Percentage Interests." With respect to distributions:

> If the General Partner shall determine that there is cash available for distribution, such cash shall be applied and distributed:
>
> (a) First, to the discharge, to the extent required by any lender or other creditor, of debts

___

[10]See supra note 8. According to Mr. Lipof's letter dated Dec. 31, 1995, the value of the Smithfield property was $320,000.

and obligations of the Partnership and management fees;

 (b) Second, to fund reserves for working capital, improvements or replacements or contingencies, to the extent deemed reasonable by the General Partner; and

 (c) Thereafter, to the Partners in proportion to their respective Percentage Interests.

(3) Each FLP had as its general partner a corporation (sometimes referred to as the corporate general partners): (a) RMA Smithfield/Walpole Management Company, Inc. (RMA, Inc.); (b) DAS Tyngsboro Management Company, Inc. (DAS, Inc.); and (c) DAC Tyngsboro Management Company, Inc. (DAC, Inc.). The president of DAS, Inc., and DAC, Inc., was Mr. Goldman, decedent's limited guardian ad litem, who had the "exclusive right" to manage those FLPs. Similarly, Mr. Harold E. Rubin was named president of RMA, Inc., and accordingly, he also had management responsibilities over the RMA FLP.[11] As the presidents of the corporate general partners, Messrs. Goldman and Rubin acted in a fiduciary capacity for decedent and had complete discretion to determine how much money decedent needed from the FLPs to meet her needs.

(4) By and through her legal representatives, decedent also formed three separate revocable trusts (the family trusts) to hold her stock in the corporate general partners. In 1995, the

---

[11]Mr. Rubin was the limited guardian ad litem of decedent with respect to the interests of Mr. Richard Abraham in her estate.

following family trusts were formed: The DAS Family Trust, the DAC Family Trust, and the RMA Family Trust. Mr. Goldman was named the trustee of the DAS and DAC family trusts, and Mr. Rubin was initially named the trustee of the RMA family trust.[12] Under the agreement for each family trust, the trustee was granted the following power:

> During Ida's lifetime the Trustees in their discretion shall pay the net income and principal of the trust property to Ida during her lifetime for her benefit and may also make payments to any one or more of her * * * [children: Mr. Richard Abraham, Ms. Cawley, and Ms. Slater and their] issue and the spouse of * * * [children] to utilize gift tax exclusions.

Upon her death, the trustee was to transfer the balance of the principal of the trust property to separate "family trusts" for the benefit of decedent's children, Mr. Richard Abraham, Ms. Cawley, and Ms. Slater, or in accordance with each child's general power of appointment.

Initially, with respect to the DAS and DAC FLPs, decedent held a 98-percent limited partnership interest, the corporate general partners, DAS, Inc., and DAC, Inc., each held a 1-percent interest, and Ms. Cawley and Ms. Slater each held a 1-percent interest.[13] Similarly, decedent initially held a 99-percent

---

[12]Mr. Richard Abraham and his wife, Jacqueline, became cotrustees of the RMA Family Trust on Jan. 15, 1996.

[13]Except for a letter discussed infra, there is no indication in the record that Ms. Cawley and Ms. Slater paid any consideration for 1-percent interests in the FLPs. See infra
(continued...)

limited partnership interest in the RMA FLP, and RMA, Inc., held

the remaining 1-percent interest.  On December 26, 1995, Mr.

Richard Abraham was given a 30-percent interest in the RMA FLP in

exchange for the settlement of his claims against decedent's

estate.

In a letter dated November 9, 1995, Mr. William D.

Kirchick[14] explained to Ms. Cawley and Ms. Slater the methodology

used in determining the value of interests in the FLPs.  The

starting point was Mr. Lipof's appraisal valuing the Tyngsboro

property at $1.8 million or $900,000 in each partnership.[15]  Mr.

Kirchik then applied a 15-percent minority and a 25-percent

marketability discount, arriving at a value of $5,795 for each 1-

percent limited partnership interest.  Similarly, in a letter

dated January 2, 1996, Mr. Kirchick explained his methodology to

determine the value of the RMA FLP.  The starting point was Mr.

Lipof's appraisal that the Walpole and Smithfield properties had

---

[13](...continued)
note 15.

[14]With the agreement of decedent's family and their
respective representatives, the probate court appointed Mr.
Kirchik to "work with David Goldman in creating the limited
partnerships and any and all supporting documents necessary to
implement said limited partnerships."

[15]In a letter dated Nov. 9, 1995, Mr. Kirchick explained
that the daughters were deemed to have made capital contributions
of 1 percent of the total value of the partnership as their
initial capital contribution, or $9,091 each.  Thus, he
calculated a total value for each partnership of $909,091 or
$9,091 for each 1-percent interest before applying discounts.

a combined fair market value of $870,000. He then applied the same 15-percent minority and 25-percent marketability discounts to arrive at a net asset fair market value for each 1-percent interest in the RMA FLP of $5,546. In both of the aforementioned letters, however, Mr. Kirchick noted that "no representation is made that these discounts will hold up or that you will be entitled to the full amount of the annual exclusions claimed for the gifts made."

In October 1995, Ms. Cawley transferred $160,000 to decedent's checking account to purchase an interest in the DAC FLP. In exchange for $151,000 of the $160,000 paid, Ms. Cawley received a 26.057-percent interest in the DAC FLP.[16] Likewise, in October 1995, Ms. Slater transferred $160,000 to decedent's checking account in exchange for a 27.783-percent interest in the DAS FLP.[17]

On March 25, 1996, Ms. Cawley wrote a $30,000 check to the DAC FLP and a $40,000 check to the DAS FLP. The checks were written from a joint account held in both Ms. Cawley and Ms.

---

[16]The record does not disclose why $9,000 was also not credited as consideration for the purchase of an interest in the DAC FLP. However, it is clear that the parties used the discounted value to calculate the percentage received in the exchange: 26.057 percent interest x $5,795 = $151,000.31.

[17]Apparently, although she paid only $160,000, Ms. Slater was credited with having paid $161,000. It is clear that the parties used the discounted value to calculate the percentage received in the exchange: 27.783 percent interest x $5,795 = $161,002.48.

Slater's names.  In exchange for the $30,000 paid to the DAC FLP, Ms. Cawley received an additional 5.178-percent interest in the DAC FLP, and in exchange for the $40,000 paid to the DAS FLP, Ms. Slater received an additional 6.904-percent interest in the DAS FLP.

On March 1 and April 4, 1997, Ms. Cawley wrote two checks to the DAC FLP, each in the amount of $25,000, and in exchange for these amounts paid to the DAC FLP, she received an additional 8.64-percent interest in the DAC FLP.  Similarly, on March 5 and April 8, 1997, Ms. Slater wrote two checks to the DAS FLP, each in the amount of $25,000, and in exchange for the amount paid to the DAS FLP, Ms. Slater received an additional 8.63-percent interest in the DAS FLP.

In each of 1995, 1996, and 1997, decedent, through her limited guardian ad litem, made gifts of 1.726-percent interests in the DAS FLP to Ms. Slater, her husband, and their two children.  Likewise, gifts were made of 1.726-percent interests in the DAC FLP to Ms. Cawley, her husband, and their three children in each of 1995, 1996, and 1997.  Similarly, gifts of 1.803-percent interests in the RMA FLP were made to Mr. Richard Abraham and his family in 1995, 1996, and 1997.[18]

---

[18]During 1995, 1996, and 1997, decedent gifted a total 23.439 percent of the RMA FLP to Mr. Richard Abraham and his family.

On June 9, 1997, decedent Ida Abraham died in Boston, Massachusetts.  On the date of decedent's death, the fair market value of the Tyngsboro property was $2.2 million, and the fair market value of the Walpole and Smithfield properties was $830,000.  After decedent's death, Ms. Cawley received a $93,078.62 distribution from the DAC FLP, and Ms. Slater received a $120,869.42 distribution from the DAS FLP.

Mr. Lipof determined the values of the FLPs for purposes of valuing the decedent's taxable estate, as of the date of death. In a letter dated January 20, 1998, Mr. Lipof appraised the value of the RMA FLP at $830,000 by looking at the value of the underlying properties that FLP held.[19]  Mr. Lipof valued decedent's supposed 45-percent interest at a "gross book value" before discounts of $373,500.  He then stated that a 30- to 40-percent discount of the "gross book value" would be appropriate, estimating the market value of decedent's interest to be $242,750.  Under a similar methodology, Mr. Lipof determined that the Tyngsboro property had a value of $2.2 million.  Mr. Lipof explained that at the time of decedent's death, she owned 33.3 percent in the DAS and DAC FLPs, with a value before discounts of $733,333.  Applying the same 30- to 40-percent discount, Mr. Lipof opined that the market value of decedent's interest in the

---

[19]Mr. Lipof was a real estate consultant.

partnerships at the time of her death was $476,666 or $238,333 for each partnership.

On Schedule F, Other Miscellaneous Property Not Reportable Under Any Other Schedule, of the estate tax return, the estate reported the following miscellaneous property:  (1) RMA FLP, 45 percent interest, value at date of death $242,750; (2) DAS FLP, 33.3-percent interest, value at date of death $238,333; and (3) DAC FLP, 33.3-percent interest, value at date of death $238,333. In the notice of deficiency, respondent determined that 70 percent of the fair market value of the assets in the RMA FLP[20] and 100 percent of the fair market value of the assets held in the DAC and DAS FLPs were includable in decedent's taxable estate.

## OPINION

### A.  Burden of Proof

Generally, the burden of proof is on the petitioner.  See Rule 142(a).  However, in certain circumstances the burden of proof shifts to the Commissioner.[21]  For example, a new matter or theory raised by the Commissioner can cause the burden to shift

---

[20]On brief, respondent explains:

In determining the includible value, the examiner erroneously treated Richard's [Abraham] relinquishment of his right to share in Mrs. Abraham's estate as consideration for purposes of I.R.C. § 2043, and subtracted it from the $830,000 date of death net asset value of the partnership.

[21]Neither party argued the applicability of sec. 7491.

if "it either alters the original deficiency or requires the presentation of different evidence." Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989).

The estate argues on brief that the burden should shift to respondent because the notice of deficiency was not sufficient to put the estate on notice of the factual basis of respondent's determination. The estate argues:

> Certainly a code section reference may have legal meaning to a tax professional or other students of the tax code but, a reference [in the notice] in this case to Section 2036 is of no descriptive assistance to a taxpayer.
>
> *        *        *        *        *        *        *
>
> The statements contained in the Notice indicate that the transfers were made for less than full and adequate consideration in money and monies worth but fails to describe why the consideration was inadequate and further fails to state the amount of consideration the Respondent would consider adequate.

In Shea v. Commissioner, 112 T.C. 183, 197 (1999), this Court held:

> where a notice of deficiency fails to describe the basis on which the Commissioner relies to support a deficiency determination and that basis requires the presentation of evidence that is different than that which would be necessary to resolve the determinations that were described in the notice of deficiency, the Commissioner will bear the burden of proof regarding the new basis. * * *

In that case, since the notice did not describe section 66(b) as respondent's basis for disallowing the benefits of community property law to the taxpayer, we treated the section 66(b) issue

that the Commissioner raised as a "new matter" for which the Commissioner should bear the burden of proof.

In the instant case, respondent identified both the legal and factual bases for his determination, stating, inter alia, in the notice of deficiency:

> It is determined that the decedent/guardian transferred DAS, Tyngsboro Family Limited Partnership for less than adequate and full consideration in money or money's worth and that the decedent, through the guardian, retained an interest in the asset. Therefore, pursuant to I.R.C., section 2036, the fair market value of the asset is includible in the decedent's gross estate. Accordingly, the taxable estate is increased by $1,100,000.00.

Under that same reasoning, respondent determined that the full fair market values of the DAC FLP and the RMA FLP, $1.1 million and $581,000,[22] respectively, should also be included in decedent's taxable estate. Despite the estate's protestations on brief, it is clear that the estate understood the basis of respondent's determination. For example, in paragraph 4 of the petition, the estate states:

> (a) The Commissioner erred in reclassifying the Decedent's thirty three and one third percent (33.3%) interest in the DAS Tyngsboro Family Limited Partnership ("DAS") originally returned at a value of $238,333.00 on Schedule F, Item 3 of the Estate Tax Return. The Commissioner has taken the position in his reclassification that 100% of the DAC Family Limited Partnership is to be included on Schedule G of the Estate Tax Return. The Commissioner further errs in valuing the 100% interest in DAC at more than $238,333.00. * * *

And in paragraph 5 of the petition, the estate states:

---

[22]See _supra_ note 20.

(g)  The fractional share gifts of the Limited Partnership interest made by the Decedent * * * were made outright, absolutely, and unconditional.  The Decedent retained no incidents of ownership and had no further rights with respect to the Limited Partnerships, either express or implied.

We think the description in the notice is sufficient to provide the estate with a description of the factual and legal bases for respondent's deficiency determination and that respondent has not raised any new issues.  Accordingly, we find that the burden of proof does not shift to respondent.

B.  <u>Section 2036--Full Inclusion of the FLP Interests</u>?

In the notice of deficiency, respondent determined that decedent transferred interests in the FLPs "for less than adequate and full value in money or money's worth and that the decedent, through the guardian, retained an interest" in the FLP interests transferred and that the full fair market values of the FLPs should have been included in decedent's gross estate.[23]  On brief, respondent explains that the interplay between the probate court's decree and the estate plan documents themselves expressly created for decedent, through her duly appointed legal representatives, a retained right to all the income that the FLPs generated.  Alternatively, respondent argues that there was an implied agreement between decedent's children and the limited

---

[23]See <u>supra</u> note 20.

guardian ad litem that decedent would retain the right to the income generated by the FLP interests transferred.

Generally, the Code imposes a tax on the transfer of a decedent's property in his taxable estate. Sec. 2001(a). The "taxable estate" is defined as the value of the gross estate, less applicable deductions. Sec. 2051. In turn, the gross estate includes "all property, real or personal, tangible or intangible, wherever situated" to the extent provided in sections 2033 through 2045. Sec. 2031(a). Section 2033 provides that "The gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Included in the broad definition of gross estate is that property described in section 2036, which provides in pertinent part:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

The general purpose of section 2036 is to "include in a decedent's gross estate transfers that are essentially testamentary--i.e., transfers which leave the transferor a significant interest in or control over the property transferred during his lifetime."  United States v. Estate of Grace, 395 U.S. 316, 320 (1969); see also Estate of Harper v. Commissioner, T.C. Memo. 2002-121.  "Thus, an asset transferred by a decedent while he was alive cannot be excluded from his gross estate unless he 'absolutely, unequivocally, irrevocably, and without possible reservations, parts with all of his title and all of his possession and all of his enjoyment of the transferred property.'"  Estate of Thompson v. Commissioner, T.C. Memo. 2002-246 (quoting Commissioner v. Estate of Church, 335 U.S. 632, 645 (1949)).

The statute describes a "broad scheme of inclusion," which is not limited to the form of the transaction, but concerns "all inter vivos transfers where outright disposition of the property is delayed until the transferor's death."  Guynn v. United States, 437 F.2d 1148, 1150 (4th Cir. 1971).  The statute "effectively includes in the gross estate the full fair market value, at the date of death, of all property transferred in which the decedent had retained an interest, rather than the value of only the retained interest."  Estate of Thompson v. Commissioner,

<u>supra</u> (citing <u>Fidelity-Philadelphia Trust Co. v. Rothensies</u>, 324 U.S. 108 (1945)).

Possession or enjoyment[24] of the property transferred is retained where there is an express or implied understanding among the parties at the time of the transfer, even if the retained interest is not legally enforceable.[25] <u>Estate of Harper v. Commissioner</u>, <u>supra</u> (citing <u>Estate of Maxwell v. Commissioner</u>, 3 F.3d 591, 593 (2d Cir. 1993), affg. 98 T.C. 594 (1992)); see also sec. 20.2036-1(a), Estate Tax Regs. ("An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, express or implied, that the interest or right would later be conferred."). "The retention of a property's income stream after the property has been transferred is 'very clear evidence that the decedent did indeed retain possession or enjoyment.'" <u>Estate of Schauerhamer v.</u>

---

[24]The term enjoyment is "synonymous with substantial present economic benefit." <u>Estate of McNichol v. Commissioner</u>, 265 F.2d 667, 671 (3d Cir. 1959), affg. 29 T.C. 1179 (1958); see <u>Estate of Reichardt v. Commissioner</u>, 114 T.C. 144, 151 (2000).

[25]Whether there exists an implied agreement is a question of fact to be determined with reference to the facts and circumstances of the transfer and the subsequent use of the property. <u>Estate of Reichardt v. Commissioner</u>, <u>supra</u>. And, the taxpayer "bears the burden (which is especially onerous for transactions involving family members) of proving that an implied agreement or understanding between decedent and his children did not exist when he transferred the property at issue to the trust and to the partnership." <u>Id.</u> at 151-152; see also <u>Estate of Hendry v. Commissioner</u>, 62 T.C. 861 (2000).

Commissioner, T.C. Memo. 1997-242 (quoting Estate of Hendry v. Commissioner, 62 T.C. 861, 873 (1974)).

It is clear from the documentary evidence and the testimony elicited at trial that, regardless of the form of decedent's transfers, she continued to enjoy the right to support and maintenance from all the income that the FLPs generated. According to the decree (the document which authorized the creation of the FLPs), decedent's needs for support were contemplated first from the income that the FLPs generated. Only after decedent's support needs, if any, were met did the children/limited partners receive their proportionate share of the partnership income. Decedent's support needs were treated as an obligation of the FLPs. For example, the decree provided that decedent's children

> shall receive income from said * * * [FLPs] * * * after deducting from the gross income of the partnership all fees, taxes, partnership administration expenses, reserve for expenses and monies needed in the discretion of the limited Guardian ad litem * * * for Ida Abraham's support.

In the decree, decedent's children agreed that they would

> share equally any and all costs and expenses related to * * * the support of Ida Abraham insofar as the funds generated by Ida Abraham's properties maintained by her do not provide sufficient funds for her adequate health, safety, welfare and comfort as determined by the limited Guardian ad litem * * *

The document further provided:

> Ida Abraham's living arrangement shall remain in accordance with the present arrangement and every effort will be made to maintain her in "status quo." Her segregated assets

shall be maintained at a level established by the limited Guardian <u>ad</u> <u>litem</u> in his sole discretion.

Even the decree to compromise Mr. Nicholas Abraham, Sr.'s will expressly contemplated that decedent would retain the right to all the income generated:

The undersigned agree to compromise the will of Nicholas Abraham by substituting for the Nicholas Abraham 1987 Trust four (4) separate trusts, each of which shall have as trustee one (1) of the four (4) living children of Nicholas Abraham (Nicholas A. Abraham, Donna Cawley, Richard Abraham, and Diana Slater). The current income beneficiary of each trust shall be Ida Abraham, the surviving spouse * * *. Each trustee shall have the power to invade principal for the benefit of Ida Abraham * * * in the trustee's sole discretion necessary for the health, support, and maintenance of Ida Abraham * * *.

Decedent's retention of the right to all income that the FLPs generated is evident from testimony elicited at trial. Ms. Cawley testified as follows:

Q: Did you have any pre-arrangement with Mr. Goldman other than the Court order as to how -- what income or assets that your mother could receive?

A: No. The arrangement was my mother lives a status quo time. The [sic] always lived. Nothing was to change.

\* \* \* \* \* \* \*

A: * * * And my mother needed to be protected. And the only way to protect her was to form these partnerships. Paid off her legal fees by using her personal assets, but the partnerships assured me that she would be constantly protected. She would never want for anything. There would always be money there. And if there wasn't money in her partnership fund, it had to come out of my partnership shares or my brother's, but the protection was there for her as a guarantee that she would live status quo.

\* \* \* \* \* \* \*

Q:    You said that if the money wasn't sufficient from her [decedent's] share of the partnerships to pay for her needs, extra funds would come out of your share, your sister's share and your brother's share?

A:    Yes.  And that's why my sister and I purchased shares. * * * When we came up with the agreement for the limited partnerships, it was the thing that anybody ever agreed to; the three of us finally agreed to something.  Judge Gould sat at a table with us months, every day for three weeks straight.  She sat at the conference table with us and worked this out with us.

           *      *      *      *      *      *      *

Q:    Now, you testified on direct that your mother had the right to income from her share, correct?

A:    Yes.

Q:    But you also testified earlier that if there hadn't been enough income from her share, she would have been able to get the income from your share and your sister's share?

A:    Yes, I did say that.  I would have given my mother money to take care of her living.  It was from my share and personal assets.

Q:    So, that if she had had an extraordinary expense in any given month, like an un-reimbursable medical bill, you would have paid it, right?

A:    Yes, I would have.

Q:    And you would have sought reimbursement from that expense from Mr. Goldman first?

A:    Yes, I would have.

Q:    And if it absorbed all of the income from the partnerships for that month, Mr. Goldman -- you still would have asked for it from Mr. Goldman, right?

A:    I would have asked for it.

Q:    And he would have paid it?

A:    Yes.

Q:    In fact, you were under a duty for -- Mr. Goldman was
under a duty to pay the full amount of Ida's expenses,
right, under -- pursuant to Exhibit 11(j) [the decree]?

A:    Whatever her own personal assets did not cover, yes.

Similarly, Mr. Goldman's testimony echoes decedent's retained right to all the FLP income.  According to his testimony, money earned from leasing the properties that two of the three partnerships owned was collected into bank accounts solely controlled by Mr. Goldman.  Ms. Cawley sent Mr. Goldman accountings "as to what was expended" for decedent's maintenance and support on a monthly basis and therein indicated the month's support "shortfall"; i.e., the extent to which her income from other sources was not sufficient to pay her expenses for that month.  Mr. Goldman testified:  "It was my responsibility to make up the shortfall" from the moneys earned by the FLPs.  The partnerships shared equally in these "shortfalls".[26]  Mr. Goldman testified that he had a fiduciary duty to ensure decedent maintained a "status quo" of support and comfort and that the decree "indicated to * * * [him] that that was a priority in the allocation of [partnership] funds."  He had discretionary power to pay out such sums from the partnerships he deemed necessary for decedent's support and maintenance.  He testified that after paying all decedent's expenses, he paid the excess partnership

_____

[26]Mr. Goldman sent Mr. Rubin a reimbursement request for one-third of the monthly "shortfall" which was to come from the RMA FLP.

income to the daughters.  Finally, Mr. Goldman testified as follows:

> Q:   Now, in regard to the status quo paragraph, if Mrs. Abraham's expenses had increased, say she had some extraordinary medical expenses that weren't covered, you would have continued to pay whatever expenses were necessary out of the partnership accounts, right?
>
> A:   I would have done everything necessary, because I thought that was my prime appointment, reason for my appointment to do that, but as you said, it never occurred.

The documentary evidence, including the stipulated decree of the probate court, and the understanding of decedent's children and legal representatives demonstrate that decedent was entitled to any and all funds generated from the partnerships for her support <u>first</u>.  Only after this could any excess be distributed in proportion of the partners supposed ownership interests.  Here, it is clear that at the time of the transfers, decedent explicitly retained the right to the income that the FLPs generated to the extent necessary to meet her needs.  Accordingly, we sustain respondent's determination that decedent retained the enjoyment and use of the FLP interests transferred within the meaning of section 2036.

Section 2036(a) excepts from inclusion property transferred pursuant to a "bona fide sale for an adequate and full consideration in money or money's worth".[27]

---

[27]In construing bona fide sale, "the word 'sale' means an exchange resulting from a bargain."  <u>Estate of Harper v.</u>

(continued...)

> To constitute a bona fide sale for an adequate and full consideration in money or money's worth, the transfer must have been made in good faith, and the price must have been an adequate and full equivalent reducible to a money value. If the price was less than such consideration, only the excess of the fair market value of the property (as of the applicable valuation date) over the price received by the decedent is included in ascertaining the value of his gross estate. [Sec. 20.2043-1(a), Estate Tax Regs.[28]]

See sec. 20.2036-1(a), Estate Tax Regs.

In the notice of deficiency, respondent determined that decedent did not receive adequate and full consideration for the FLP interests transferred to her children. Clearly, decedent did not receive any consideration for the gifted interests. Thus, what remains at issue is whether the daughters' supposed payments constituted the commensurate consideration.[29]

---

[27](...continued)
Commissioner, T.C. Memo. 2002-121 (quoting Mollenberg's Estate v. Commissioner, 173 F.2d 698, 701 (2d Cir. 1949)).

[28]As the Court stated in Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951):

> the exemption from tax is limited to those transfers of property where the transferor or donor has received benefit in full consideration in a genuine arm's-length transaction; and the exemption is not to be allowed in a case where there is only contractual consideration but not "adequate and full consideration in money or money's worth." * * *

[29]In the notice, respondent gave the estate credit for 30 percent of the value of the RMA FLP on the basis of Mr. Richard Abraham's settlement of his claims against decedent's estate. See supra note 20. Despite his position on brief that the auditor's determination was erroneous, respondent explains that he is not seeking an increase in the deficiency amount.

As found above, in October 1995, Ms. Cawley and Ms. Slater each transferred $160,000 to their mother in exchange for certain percentages in their respective FLPs.[30] The problem here is that there is no evidence as to the fair market value of the FLP interests on the date that the daughters purchased them. The percentages that the daughters received in the exchange were on the basis of Mr. Lipof's appraisal of the underlying real estate. Mr. Kirchik then applied minority and marketability discounts to arrive at a price per 1-percent interest. There is no evidence that the discounts taken under these facts were appropriate. Indeed, in his letters, Mr. Kirchik specified that he made "no representation * * * that these discounts will hold up". While we agree that in certain circumstances discounts may be appropriate in valuing interests in property, nonetheless there must be some showing that the discounts taken were appropriate. Mr. Kirchik's letters[31] provide no basis upon which we may judge whether the discounts taken were appropriate. There are no expert witness reports in the record, and no experts testified at trial. Accordingly, we agree with respondent that the record fails to demonstrate that these payments constitute adequate and full consideration as required by section 2036. However, we do

---

[30]See supra notes 16 and 17.

[31]Mr. Kirchik did not testify at trial.

note that respondent grants the estate credit for these payments under section 2043.

The estate also argues that respondent erroneously failed to give it credit for additional amounts that Ms. Cawley and Ms. Slater paid. Specifically, in his determination respondent failed to acknowledge that in 1996 and 1997 Ms. Cawley and Ms. Slater paid an additional $80,000 and $90,000, respectively, for which they received additional interests in the FLPs. The evidence demonstrates that these amounts, unlike the initial $160,000, were not paid to decedent, but instead to the FLPs themselves.

The estate fails to cite any authority upon which we may rely, and we cannot see how these amounts could constitute consideration if they were not paid to decedent.[32] Indeed, the evidence does show that after decedent's death, Ms. Cawley received a $93,078.62 distribution from the DAC FLP, and Ms. Slater received a $120,869.42 distribution from the DAS FLP. Accordingly, we sustain respondent's determination that these additional amounts that Ms. Slater and Ms. Cawley paid directly to the FLPs should not reduce the amount included in decedent's gross estate under section 2036.

---

[32]If the children were buying part of decedent's interest in the FLPs, decedent and not the FLPs should have received those purchase moneys.

C.  Conclusion

The record demonstrates that the structure that decedent employed through her legal representatives and family was merely a testamentary vehicle employed to shift her assets to future generations while maintaining her continued right to benefit from the FLP interests transferred.  This is precisely the type of situation for which section 2036 was created.  Accordingly, we sustain respondent's determination, subject to the parties' concessions.

Decision will be entered

under Rule 155.